[No. B091251. Second Dist., Div. Four. July 25, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
HENRY CASTORENA, Defendant and Appellant.

**COUNSEL**

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Susan D. Martynec and Juliet H. Swoboda, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**EPSTEIN, J.**—Henry Castorena appeals from the judgment entered following a jury trial that resulted in his conviction of second degree murder. (Pen. Code, § 187, subd. (a)(1).)[1] He was sentenced to prison for the term of 15 years to life.

Appellant contends that during deliberations the trial court improperly excused a juror who believed in appellant's innocence. We reverse the judgment and remand the matter for a new trial based on the trial court's prejudicial failure to conduct a sufficient inquiry into the allegations of juror misconduct.

### FACTUAL SUMMARY

"On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. . . ." (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) That evidence showed that appellant operated a towing service out of his home with the assistance of his wife, Hortensia. She wanted appellant to sell the business and retire. They had frequent heavy discussions because appellant wanted to continue.

Appellant, who enjoyed gambling, often "lost his shorts" on trips to Las Vegas. At one time, he attempted to borrow $15,000 from his daughter,

---

[1]All further section references are to the Penal Code unless otherwise indicated.

Sandra Saenz. Saenz refused because she had worked hard to save money. Appellant replied, " 'I know you have it. You are like your mother. You know how to save.' " Hortensia was concerned about going into debt. Sandra refused his renewed request for money. He was upset that she would not give him a loan. Sandra later told Hortensia about their conversation. Hortensia was surprised about his request for money.

On September 12, 1993, about 5:30 or 6 p.m., appellant and Hortensia unexpectedly stopped for a visit at the residence of Lydia Villalavazo, appellant's sister. Hortensia told appellant that she wanted him to retire because she wanted to travel. Hortensia and appellant argued about his retirement but they did not seem upset and spoke in a normal manner. They left around 7 or 7:30 p.m.

A month or two before, Henry Castorena, Jr., the son of Hortensia, and appellant's stepson, observed appellant and Hortensia in a minor argument in the kitchen. After Hortensia turned her back, appellant made a gesture as if he were choking her. He then tried to laugh it off as a joke when he saw Henry. Turning around, Hortensia said, " 'You wish you could do that to me don't you?' " Appellant denied any such intent. On a subsequent occasion around that time, unaware that Henry was watching, appellant made the same motion when Hortensia's back was turned. On a different occasion Sandra saw appellant gesture behind Hortensia's back as if he were strangling her. Turning, Hortensia said, " 'Yeah, you would like to do that; wouldn't you?' "

Sometime around 10 or 11 p.m. on September 12, 1993, appellant strangled Hortensia. About 8:30 a.m. the next day, Henry arrived and used his keys to unlock their residence because no one was there. He thought it strange that his mother was not present. When appellant appeared about 15 to 20 minutes later, Henry asked about his mother. Appellant replied that she had things to do and he saw her leave early that morning. Appellant's hands appeared swollen, and he looked as if he had been up most or all of the night. He had a reddish bruise on his left cheek, and there was a scratch on the right side of his face by his nose and scratches on his back. When asked what had happened, appellant said he hurt himself while working on the truck. This explanation, however, was odd because what he had been doing could cause someone to become dirty or burned by exhaust, but not scratched.

Around 9 p.m., Michael Lugo, the grandson of Hortensia and appellant, asked about Hortensia. Appellant said she had not yet returned home. He then left and returned with food. When Michael asked why he did not bring

any food for Hortensia, he replied that she would not be eating that night and she was not going to come home.

About 10 or 10:30 p.m., Sandra arrived and asked about Hortensia because it was not like her to be gone the entire day. Appellant told her that she left early that morning and he did not know where she was. He did not appear concerned. Appellant, however, normally told Hortensia when she could go on an errand, and she would do as he desired.

Around 11 p.m., Yolanda Lugo arrived at the residence. She was Michael's mother and Hortensia's daughter. She had threatened to call the police if appellant did not. Los Angeles Police Officer George Marentes responded to appellant's missing person call. Appellant met him at the front property line and did not express any emotion during their conversation. He told the officer that he did not know what Hortensia had been wearing because he left before she exited the bathroom, that she had never done anything like this before, and that they did not have any type of argument.

The next day Yolanda, Sandra, and Joseph searched the residence for clues about Hortensia's whereabouts. The bedding normally on the bed shared by appellant and Hortensia was missing and could not be found in the house. Although Sandra found Hortensia's purse, her glasses were missing as well as her keys and her wallet. In the bedroom Yolanda found blue pajama bottoms with blood on the upper right hand portion near the waistband. A pair of bloodstained socks belonging to appellant were found in his exclusive hamper. A living room curtain also had blood on it.

Joseph Castorena, Henry's son and appellant's grandson, noticed bloodstains only on his grandmother's side of the bed. Under the bed there appeared to be bloodstains on the carpet and more bloodstains were on pictures, a box for a portable radio, and a bra hanging over a chair.

On November 13, 1993, Yolanda's husband John found Hortensia's remains under the house. The body, which was highly decomposed, mummified and partially skeletonized, was wrapped in a large sheepskin which was tied with rope around the shoulder area and the neck with more rope encircling the waist. She was wearing blue pajama tops which matched the bloodstained bottoms found at the house.

The body suffered four fractures, two of the thyroid cartilage larynx, one of the hyoid bone high in the neck, and one of the cricoid cartilage. These fractures were consistent with strangulation commonly caused with the hands rather than by a ligature such as a rope. Although the exact cause of

death could not be determined because of the decomposition, these fractures in a living person could be fatal, and there was no evidence of any other fatal injuries to the body. The rope around the neck could not have caused the fractures. Some of the fingernails had broken ragged edges. The scratches on appellant were consistent with wounds which might be found on a strangler.

Appellant presented a defense based on accident and heat of passion. Doctor Ronald Kornblum testified that based on the medical evidence, a heart attack could not be ruled out as a cause of death.

Around 5 or 6 p.m. on September 12, 1993, appellant and Hortensia had dinner at a restaurant before proceeding to his sister's house. En route Hortensia complained that his $ 7 or $ 8 tip on the $ 26 or $ 27 dollar check was too much.

Although the argument ceased upon arrival at their destination, Hortensia resumed her complaint in their bedroom sometime after they returned home around 8 p.m. When he said they could talk about it the next day, she insisted the matter be settled that night. He announced that he was going to the upstairs bedroom and began to rise. Hortensia kicked him in the groin. She had never done anything like that before. He kicked her back and she went off the bed. When she said, " 'You hurt me. I am bleeding,' " he went around to help her get up. He backed away, however, when she told him not to touch her.

Getting up, she lunged at him and scratched his face. He tried to hold her around the waist while she was scratching and trying to kick him. They both fell down. When they got up, he walked to the front of the bed so they could talk. She came from behind and scratched his back. During the ensuing struggle, they fell down two more times. When she finally stopped struggling, appellant, thinking she was tired, lay her down on the floor. He became scared, however, when he checked for her pulse and heart beat without success. Instead of calling 911, he waited several hours before wrapping her body in a sheepskin blanket secured with ropes, dragging her body through a crawl space and burying her under the house.

## DISCUSSION

Appellant contends that during deliberations the trial court improperly excused Juror Patricia S. simply because she disagreed with the other jurors. We conclude the record reflects the trial court abused its discretion in failing to conduct a sufficient inquiry into the allegations of juror misconduct, that

this error was prejudicial, and that reversal of the judgment for a new trial is required.

## I.

### *Factual and Procedural Summary*

Jury deliberations began on the afternoon of November 16, 1994. On November 23, 1994, at 3:10 p.m., the court informed counsel that it had received two notes from the jury. The first requested an explanation of malice aforethought and indicated "[t]here is one [j]uror that understand[s] the [i]nstructions and the evidence, yet [is no]t whole heartedly [c]onvinced that Malice Aforethought existed ([p]resent or [p]ast)." The second note asked for the readback of appellant's testimony regarding what transpired after he and the victim left his sister's until he obtained the sheepskin.

After rereading CALJIC No. 8.11, which defines malice aforethought, the trial court informed the jury that because "[i]t sounds from your note as if you are sort of 11 to 1 on this issue as to whether it is malice aforethought[,] . . . I will send you back into the jury room to deliberate on this. I don't know whether reading the instructions helped. If you absolutely can't agree and come to a verdict, send us a note."

On November 29, 1994, at 11:10 a.m., the court informed counsel about two new notes from the jury. One asked for the legal definitions of "intentional" and "deliberate" and a clarification as to whether the two words were interchangeable. The other was a note submitted by the jury foreperson Charles C. but written by juror No. 12, Denise H. The noted stated: "I believe we have a juror who is not using the evidence of the case and the instructions of the law to base her opinion. I also believe she is not deliberating to express her opinions and reasons why she believes the way she does. [¶] It is also my opinion that I am not the only person who feels this way."

Outside the presence of the jury, the court held a hearing on the second note. It announced that "[t]he court's inquiry is whether this particular juror is deliberating, whether she is—whether she is engaging in a give and take and expressing a reason for her views and engaging in a give and take, not the content. [¶] I don't want to know the content of what anyone is saying in there." The court first questioned the foreperson. He identified the juror who allegedly was not deliberating as Patricia S., who was juror No. 6. When asked whether she was deliberating back and forth, stating what her views were and the reasons for them, Charles C. responded, "I believe she is

deliberating." When asked if the juror was stating what she feels to the other jurors, he replied, "Yes."

After excusing the foreperson, the court questioned Denise H. When asked why she thought Patricia S. was not deliberating, Denise H. replied that with regard to CALJIC No. 2.21.2, which pertains to a witness willfully false, "[t]here are certain things that we have to take as fact by other testimony, and I don't believe she can substantiate her claim by other testimony."

The court explained that "[i]f it is a case where you don't agree with the juror, you think the juror is off the wall, stupid, coming out of left field, if you think any of those, that doesn't itself mean she is not deliberating. [¶] Not deliberat[ing] means she will not engage in a give and take." Denise H. replied, "She is saying the ten words but in a different phrase every single time. She is not explaining herself. It is straight ahead. She says her opinion. There is nothing elaborate about it. We have tried so hard. [¶] The only time we have gotten a little bit out of her was right before our lunch today when I sent the note to you because I felt she is not explaining herself. Why is she feeling this way?" She told Patricia S. that she wanted her "to explain it to us why you feel it. She just can't explain it. [¶] We all have to express our views and opinions, and we have all done that [with] her. And [she] can't express or explain her opinion [to] us."

When asked if any other jurors felt the same way, Denise H. identified juror No. 9, Kuuipo C., No. 4, Dianne R., and No. 11, Robert S. Denise H. explained that these jurors "have expressed the same as what I have[,] that she is not giving us enough information to substantiate her claim or her opinion. . . . It is like we have said or we have expressed our view, . . . by facts from the witness stand. She expresses her view, but she won't or doesn't explain herself or back up her opinion."

The court then asked her to explain what she meant by the statement in the note, " 'I believe the juror is not using the evidence of the case and not using the law to base her opinion.' " Denise H. stated that she believed Patricia S. was speculating as to evidence that was not before the jury.

The court excused Denise H. and called Kuuipo C. When asked if she agreed with the statements in the note about a juror not deliberating, Kuuipo C. stated there was a juror who was not willing to express her opinion and identified the juror as Patricia S. She explained that when the jurors became stuck, Kuuipo C. pulled out and read from the green jury instruction packet the directives that if they arrived at a point where no agreement could be reached, everybody needed to express his or her opinions and reasons

therefor. Patricia S. responded, "No. I am not the person on trial. I don't have to tell you." Kuuipo C. also stated that on the preceding day, Patricia S. "said four times[,] I am not on trial. I do not have to tell you[,]" meaning her opinion and the reasons therefor. Kuuipo C. further stated that they asked in many different ways for her opinions and reasons, explaining to her, "[i]f you can't share with us, then we can't understand." She added that whenever Patricia S. actually says something, she couches it in terms of "I have a feeling about this. I have a feeling about that." When asked for the evidence which led to that feeling, she would say, "I don't need evidence. I have a feeling." She identified No. 7, Alexander R., and No. 11, Robert S., as jurors who shared her opinion of Patricia S.

The court then excused Kuuipo C. and called Dianne R. Dianne R. agreed that Patricia S. was not expressing her views in a back and forth manner adding, "We heard a statement over and over. 'Well, I am just not convinced.' [¶] It was hard for us. We kept asking could you tell us why you are not convinced? Could you tell us what evidence you are looking at that makes you think that way[?]" Dianne R. believed that what Patricia S. meant was that "the evidence was not enough, or it wasn't presented to her in such a way. Well, it wasn't shown to me." She stated there were other jurors who felt the same way but did not know their numbers.

In his interview Robert S. began by stating he "would have to honestly say that everyone has been deliberating." However, when he tried to qualify that statement by saying, "To the extent I might not think someone has not deliberated enough—" the court interrupted and asked specifically about Patricia S. Robert S. replied, "My personal opinion there is that she is judging the case on her feelings and not the evidence." He added, "I have heard the testimony. I heard it twice. I guess she is not hearing or doesn't want to hear it."

Marilu D., juror No. 10, informed the court that she did not "think there has been a complete back and forth exchange." When asked if she meant the entire jury or simply one or more jurors, she specifically named Patricia S. Although she thought Patricia S. believed she was deliberating, Marilu D. disagreed. She explained, "I don't think she is open to—I think she is listening to what we are sharing[, but] I don't think she is taking it and thinking about it and putting it into how she is feeling. [¶] I don't believe she is giving us—she started to a little bit more this morning. I don't think she is giving us the specifics of why she is feeling or believing what she is feeling. [¶] I don't believe that she is basing all of her—all of the few things on facts that have been presented." She added, "I don't believe they are based on facts or the evidence that has been presented in the case."

The court then informed counsel that it had "heard enough to tell the entire jury[,] to admonish them to deliberate." The court stated that "[i]t is clear we have a juror who is not deliberating. I will explain they have to exchange facts." The prosecutor then moved for excusal of Patricia S. for good cause based on her failure to deliberate. Appellant's attorney argued that this was not a case of failing to deliberate but rather of someone who disagreed with others but was unable to articulate to the satisfaction of these others. The court reiterated its finding that it was "obvious we have a failure to deliberate[]" and indicated it would give Patricia S. a warning and a chance but if the problem continued, she would be removed.

In this regard, the court informed the jury: "I received another note that alleges that a juror is not deliberating and not basing her opinion or his or her opinion on the law and the evidence that came from the words of the witnesses on the witness stand. [¶] I went over with all of you when you were questioned as to whether you were jurors in the case whether you would deliberate, and you are all under a duty to deliberate. To deliberate means what you state what you feel and how you will feel. [¶] You must be prepared to exchange your views on the law and the evidence in the case, the evidence that came out of the words of the witnesses and the documents that you have in front of you. That's a requirement. [¶] Every juror must deliberate. I am going to admonish the entire jury that you must deliberate. I will send you back. If there is any further problem, I would like to be advised of it."

On November 30, 1994, the next day, around 2:35 p.m., the prosecutor renewed her motion to excuse Patricia S. because that juror now knew the other jurors had reported her and she would become more defensive and entrenched in her position. The court disagreed, pointing out that if there were any further problems, the jurors were directed to bring them to the court's attention. The court denied appellant's motion for a mistrial.

After appellant's attorney reminded the court that it had agreed to instruct the jury that deliberating did not mean agreeing, the court recalled the jury and gave the following admonition: "[Y]esterday when I brought you out here, I told you that each and every juror on the panel has a duty to deliberate. I wanted to also mention that you shouldn't surrender any strongly held views, but you have to base your verdict on, as I told you many times when I was picking this jury, base your verdict on the evidence in the case and the jury instructions." When the court asked if everyone understood, the jurors all answered in the affirmative.

On December 1, 1994, at 11:05 a.m., the court informed counsel that it had received another note, which read, "I, Denise H[.] believe that juror # 6

Patricia [S.] is not following the law specifically [CALJIC No.] 2.21.2. We cannot get beyond this point. She is not explaining her views based on the evidence—it's based on her feeling." When the court announced its intent to call Patricia S. and ask whether she was deliberating, appellant's attorney stated, "I don't think it is necessary to call the jurors out. I think that basically the juror is explaining in this note that she doesn't like the fact that one juror is not following an instruction." After commenting that the instruction was not mandatory, he offered to share his view "as to what is going on back there." The court admonished him not to speculate. Appellant's attorney repeated that he "would say it is not even required to bring any jurors out to make any inquiry. It seems clear that the jurors disagree." He then moved for a mistrial on the ground that the jury was deadlocked, that there was "an honest disagreement based upon the evidence as to this length of time deliberating."

The court denied the motion and made "a finding of misconduct on juror number six[, Patricia S.]" The court did not agree that the jury was deadlocked and concluded that it was necessary to conduct an inquiry into whether Patricia S. was in fact deliberating. When asked if Patricia S. was deliberating, Denise H. stated that she was "deliberating to a point. It is hard to explain to you what she is not doing." When the court explained that juror misconduct does not arise simply because someone does not agree with the other 11, Denise H. responded, " I totally understand that." She then stated that although she states her opinions she does not say what evidence she is basing her opinion upon. When asked about the evidence, Patricia S. would respond, " 'This is what I feel. This is my opinion. I believe this to be true.' " When asked for the evidence to make the others believe that her feeling was true, she would respond, " 'I don't have to make you believe anything. I am not on trial here.' " Denise H. added that Patricia S. was not basing her opinion on the facts in the case, the inferences drawn therefrom, and the jury instructions. When asked if there were any other jurors who might have knowledge one way or the other about this, Denise H. identified Alexander R., Kuuipo C., Diane R., and Robert S.

When asked if Patricia S. were deliberating, Kuuipo C. informed the court that although she expressed her opinion, she was not using the testimony presented at trial. Instead, she "said she is using her feelings." When Kuuipo C. asked her many times for the exact evidence used to arrive at her opinion, Patricia S. would simply say, "I have a feeling." Although there was more sharing of opinions, no reason was given about how the opinion was reached.

Alexander R. informed the court that beginning the previous day Patricia S. had been deliberating but not before then. At first he answered in the

affirmative when the court asked if she were giving her opinions and reasons for her opinions during deliberation. However, he then asked the court to rephrase the question and expressed some concern about the reliability of his memory at that moment. When pressed by the court, he stated that he did not remember.

Dianne R. explained that although Patricia S. gave her opinions, she did not back those opinions with any evidence or interferences drawn therefrom. Her opinion "seems to be more of a belief rather than based on the evidence at a certain point."

Robert S. agreed that Patricia S. was stating her opinions to the other jurors. He added that on occasions she would also give the evidentiary basis for her opinion. However, she did not do so "consistently[,]" sometimes she did and sometimes she did not. Moreover, there were occasions where he asked her point blank about her opinion and she would not give it.

When the prosecutor asked the court whether it wanted to question Juror Marilu D., whom the court had previously questioned, the court responded that "the situation is clear from the record we have already. I don't personally see the need to do that." The prosecutor then renewed her motion to excuse Patricia S. Appellant's attorney opposed her removal on the ground that a miscarriage of justice would result. He argued that there was no evidence of failure to deliberate because Charles C., the foreperson, stated that she was deliberating, Robert S. felt she was deliberating on and off, and she was sharing her opinions rather than simply stating she made up her mind and did not care what the evidence showed. He further argued that the problem was disagreement with a viewpoint, not failure to deliberate. The court characterized his argument as speculation.

The court then found a clear case of juror misconduct based on Patricia S.'s failure to deliberate and indicated its intent to remove her and substitute an alternate juror. It explained: "The first time I questioned the jurors day before yesterday, I did make a finding of juror misconduct. The foreperson concluded that she was deliberating without stating any facts. I didn't specifically inquire further. [¶] [Patricia S.] said she wasn't explaining herself. She was using the same—I am sorry. [Denise H.] said that. She has no—strike that. [¶] [Kuuipo C.] said that [Patricia S.] said I am not on trial. I don't have to tell you my opinions and reasons for the opinions. I have a feeling about this or that. I don't need evidence. I have a feeling. [¶] There was not a give or take or sharing of opinions and testimony with [Patricia S.], juror number six. [¶] [Dianne R.] said that [Patricia S.] said I am not convinced. I won't tell you why. [Robert S.] said that [Patricia S.] was

judging the case on feelings and not the evidence. [¶] [Marilu D.] said she was not giving the other jurors specifics as to why she is feeling or believing what she is feeling. We had a number of jurors that stated flat out that [Patricia S.] is not stating her opinions or the reasons which is a fundamental requirement of jury deliberation. [¶] I made a finding that she was not deliberating. . . . [¶] I decided to admonish the jury that they had to deliberate in the case, and I sent them back."

The court added, "The next day in the afternoon we got a note that indicated that there was a possibility that this conduct was continuing. Based on the jurors that I just interviewed, I think that it is pretty clear the misconduct is continuing. [¶] [Denise H.] said that [Patricia S.] said, 'This is what I feel. I don't have to tell you. I am not on trial here.' [¶] [Patricia S.] said, 'I have a feeling.' She is giving her opinion and not the reasons for the opinions. [¶] [Alexander R.] when asked if she was giving the opinion and reasons for opinions when she was asked during the last 48 hours in every instance said he didn't remember. [¶] [Dianne R.] said that [Patricia S.] is saying that's just what I believe in response to questions for the basis for the opinion. [¶] [Robert S.] says she gives her opinion sometimes and sometimes not. Sometimes she won't respond to point blank requests for her opinions. Sometimes she will give her reasons, and sometimes she won't."

After acknowledging the court had already ruled, appellant's attorney stated, "Before the court takes the drastic measure, I would ask either the juror herself be questioned or the other jurors be questioned and/or an inquiry be made with regards [sic] to what it is that they think she is stating her opinion on that we are speculating, because what they are saying is true and accurate that she is stating her opinion based upon feelings. [¶] Her feeling may be based upon the evidence. We are speculating that these jurors know exactly what is required under the law." The court responded by finding good cause under section 233 of the Code of Civil Procedure to discharge Patricia S., adding "I think we have enough on the record. It certainly has convinced me."

The court directed the clerk to bring out the jury. Upon her return the clerk announced that the foreperson informed her that they were close to reaching a verdict. A recess was taken until 1:30 p.m. When the proceedings resumed, the court informed counsel that it had received a 15-page note from Patricia S., which she apparently drafted during the lunch break. The court found that "[t]he note is further juror misconduct [in that it is] communicating the substance of the jury deliberations to the court." Appellant's counsel disagreed and urged she may have been merely voicing her feeling that she was badgered by the other jurors and renewed his motion for a mistrial based on

the coercion applied on Patricia S., whom he considered to be a holdout juror.

After denying the motion, the court noted that it had previously made a finding of juror misconduct based on the failure to deliberate and found "further misconduct [based on her] sending the court a detailed note about the substance of the discussions." The court then allowed counsel to read the note.

After Patricia S. was excused, Cleo H., an alternate juror, was sworn as her replacement.

On December 2, 1994, appellant's attorney filed a motion for a mistrial based on the 15-page note from Patricia S. He argued that the letter showed that she was in fact deliberating, i.e., explaining her views and the reasons based on the evidence therefor, and that the reason she was accused of not doing so was her disagreement with the other jurors. He also argued that based on the letter it was clear that Patricia S. was the only one who understood the instruction about a witness being willfully false. She believed part of appellant's testimony and disbelieved the remainder, which she was entitled to do. He further argued that the jurors had deliberated for five days before any accusation of nondeliberation arose and that the letter revealed the accusation was based on Patricia S.'s suggestion that they inform the court that they were "hung," which Denise H. refused to do. Appellant's attorney added that before Patricia S. was excused the court should have asked her and the other jurors who were never questioned about the nondeliberation allegations and given them an opportunity to respond.

The court stated that it had considered the letter before excusing Patricia S. and found that the letter constituted additional misconduct. Appellant's attorney concluded by arguing that a mistrial should be declared because the jury was hung after five days of deliberation based on what Patricia S. stated in her letter.

The court denied the motion for mistrial, explaining: "I have seven to eight jurors telling me the same thing in essence. I made a finding of good cause that good cause existed [and] that she had committed misconduct. Based upon two separate interviews after warning the whole jury and giving her a second chance, the jurors were coming back and telling me the same thing. [¶] Her letter does not contradict anything those jurors told me in terms of the only relevant inquiry on the misconduct based upon failure to

deliberate, whether she gave her opinions and reasons based on the evidence." The court then marked the letter as defense exhibit D.[2]

## II.

### *Standard of Review*

■ "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court. (*People* v. *Beeler* (1995) 9 Cal.4th 953, 980 [39 Cal.Rptr.2d 607, 891 P.2d 153]) The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial. . . . [¶] [A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*People* v. *Ray* (1996) 13 Cal.4th 313, 343 [52 Cal.Rptr.2d 296, 914 P.2d 846].)

Moreover, a trial court's failure to question each juror privately regarding a juror misconduct claim presents an issue of abuse of discretion, not one of constitutional magnitude, such as whether the defendant was denied his or her right to a fair trial under the federal or state Constitutions. (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 927-928 [4 Cal.Rptr.2d 765, 824 P.2d 571].) *Pinholster* explained, "Certainly, when there is a claim of juror misconduct, the court must conduct 'an inquiry sufficient to determine the facts . . . whenever the court is put on notice that good cause to discharge a

---

[2]The 15-page handwritten document was addressed "To Whom It May Concern" and signed by Patricia S. In the note Patricia S. recounted her version of her experience on the jury. Specifically, at pages 2 and 3 she wrote: "We deliberated, we dissected we reconnected, we move[d] the evidence in every direction you can think of. I have participated fully in each and every form of the deliberation process. I have read and understand the jury's [*sic*] instructions. I understand each and every portion of the law that was presented to me."

Patricia S. stated that the accusations that she had failed to deliberate were fabricated to force her off the jury. The accusations started five days after deliberations began and were the direct result of her refusal to be intimidated by other jurors, specifically Denise H., into changing her mind. Patricia S. did not feel that defendant was guilty of second degree murder since she was not fully convinced that malice aforethought existed. She focused on appellant's testimony that his wife attacked him, kicked him in the groin, and scratched him. Although deliberations were at a standstill at least five times and Patricia S. wanted to notify the judge that the jury was deadlocked eleven to one, Denise H. disagreed, explaining she was not leaving the room without a verdict, otherwise she would feel like she had been wasting her time. When Patricia S. stated she was tired, Denise H. told her if she went home, they would get an alternate seated and have a unanimous verdict. Patricia S. felt that she was not entitled to have an opinion, i.e., she had to agree even though she happened to see it differently. However, she did indicate that besides her belief, there were eight who "strongly believe" the opposite, and "three who are in between[.]" In concluding, Patricia S. requested the court read the note and then make its decision.

juror may exist.' . . . But failure to conduct a sufficient inquiry is ordinarily viewed as an abuse of discretion, rather than as constitutional error. . . ." (*Id.* at p. 928, citations omitted.) *Pinholster* added, ". . . while individual questioning may have been preferable, we have never held that it is constitutionally required." (*Ibid.*) Nonetheless, the failure to conduct an adequate inquiry may be prejudicial. (*Ibid.*)

## III.

### Application of Standard

■ Mindful of these principles, we conclude that regardless of whether Patricia S. should have been questioned after receipt of each of the two notes, the trial court clearly abused its discretion in failing to conduct an inquiry into the allegations of juror misconduct following its receipt—prior to removal of Patricia S. as a sitting juror—of the fifteen-page document which contained new information bearing upon and contradicting the earlier allegations of misconduct on the part of Patricia S. and raising new allegations of juror misconduct on the part of Denise H. Absent such inquiry, the court did not have the requisite facts upon which to decide whether Patricia S. in fact failed to carry out her duty as a juror to deliberate or whether the jury's inability to reach a verdict was due, instead, simply to Patricia S.'s legitimate disagreement with the other jurors.

The abuse was prejudicial. Although the inquiry might have produced sufficient evidence to allow the court to disbelieve Patricia S.'s version of what had transpired, we cannot speculate about what facts might have been adduced if the inquiry had been conducted.

The record contains ample evidence corroborating Patricia S.'s allegations that the jury was deadlocked on the issue of malice aforethought and that the claim of nondeliberation arose only after Patricia S. refused to change her view. The first note received from the jury requested an explanation of the term malice aforethought because one juror, who understood the evidence and instructions, was not convinced malice aforethought existed. No juror contradicted the court when it announced that "[i]t sounds from your note as if you are sort of 11 to 1 on this issue as to whether it is malice aforethought[.]" The companion note requested a readback of that portion of appellant's testimony regarding the circumstances leading up to the victim's death, the manner of her death, and his actions thereafter until he obtained the sheepskin. These notes and the court's undisputed comment reflect that all members of the jury, including Patricia S., had been deliberating and that Patricia S. believed at that juncture that something in appellant's testimony

negated the element of malice aforethought. It was not until days later that Denise H.'s initial note alleging Patricia S.'s failure to deliberate was forwarded to the court. This evidence lends credence to Patricia S.'s averment in her 15-page note that she in fact was deliberating to render the absence of the requisite inquiry prejudicial. A contrary conclusion is not compelled by reason of the foreperson's communication to the court clerk that the jury was close to reaching a verdict. We cannot discern from the silent record whether Patricia S. simply gave up, whether she was convinced by the other 11 jurors that malice aforethought existed, or even what verdict the jury had in mind.

## DISPOSITION

The judgment is reversed and the matter remanded for a new trial.

Vogel (C. S.), P. J., and Hastings, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 2, 1996.