[No. B137926. Second Dist., Div. Three. Jan. 28, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID ANGEL DIAZ, Defendant and Appellant.

## Counsel

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Robert F. Katz and Roy C. Preminger, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KLEIN, P. J.**—Defendant and appellant, David Angel Diaz, appeals from the judgment entered following his conviction, by jury trial, for attempted

murder, aggravated mayhem, assault by means likely to produce great bodily injury, and assault with a semiautomatic weapon, with enhancements for discharging a firearm causing great bodily injury, firearm use and infliction of great bodily injury (Pen. Code, §§ 664, 187, 205, 245, subd. (a)(1), 245, subd. (b), 12022.53, subd. (d), 12022.5, 12022.7).[1] Sentenced to a state prison term of 37 years to life, Diaz contends there was trial and sentencing error.

The judgment is affirmed as modified.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established the following.

### 1. *Prosecution evidence.*

K.P. and defendant Diaz were members of the Eastlake Gang. The Eastlake Gang and the Clover Gang, bitter rivals, were at war. On the night of July 14, 1998, K.P. was driving in his car with his girlfriend, Jeanette V. K.P. saw Diaz in the street and picked him up. Neither K.P. nor Jeanette knew Diaz had a gun.

Remberto P., a member of the Clover Gang, was walking across the intersection of Griffin Avenue and Manitou Street with his girlfriend, Martha S., and her 13-year-old brother. When K.P. came to a stop sign at the intersection of Griffin and Manitou, Diaz got out of the car saying something like, "I am going to waste him," or "I am going to blast him." Diaz walked up to Remberto and asked, "Where are you from?" Remberto knew Diaz was asking what gang he was from and he replied, "I am from Clover." Diaz pulled out a handgun, shot at Remberto numerous times, and then got back into K.P.'s car. Remberto was hit twice in the leg, the bullets destroying the femoral artery of his lower leg and shattering his fibula.

K.P. drove to the home of Diaz's girlfriend, Juana C., and parked at the rear of the property. K.P., Jeanette, and Diaz got out of the car. K.P. and Jeanette walked away together, and Diaz walked away in a different direction. K.P. and Jeanette retrieved the car early the next morning.

Police Officer Armando Rodriguez responded to the scene and spoke with Remberto's girlfriend, Martha. Martha told Rodriguez she recognized the

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

gunman, whom she knew by his moniker "Drifter," and that Drifter was a member of the Eastlake Gang. Officer Juan Parga spoke to Martha a little later that same night. Martha told Parga she knew the gunman from high school, that his name was David, that he was also known as Drifter, and that he was from the Eastlake Gang. Martha identified a photograph of Diaz as the gunman.

Officer Jose Ramirez interviewed Martha about a week after the shooting. Martha told him she knew the person who shot Remberto, and that she had gone to junior high school and high school with the gunman. Martha showed Ramirez an eighth grade yearbook and pointed out a photograph of Diaz.

2. *Defense evidence.*

Diaz's sister testified that she, Diaz and his girlfriend Juana were at the movies on the night Remberto was shot.

Juana's father testified he was cleaning up his backyard sometime after 9:00 p.m. on July 14, 1998, when a small car crashed into his garage. A girl and a Chinese man got out of the car. The man pulled up his shirt and displayed a gun. Then the two of them jumped over the back fence. Juana's mother, who was inside the house, looked out the window when she heard the crash and she saw Jeanette and a man get out of the car.

## CONTENTIONS

1. The trial court erred by discharging a juror during deliberations.

2. The trial court erred by admitting the preliminary hearing testimony of a putatively unavailable witness.

3. The concurrent sentences on counts 2, 3 and 4 violate section 654.

## DISCUSSION

1. *Discharged juror.*

■ Diaz contends the trial court erred by discharging one of the jurors during deliberations. This claim is meritless.

Section 1089 allows the trial court to discharge a juror who "upon . . . good cause shown to the court is found to be unable to perform [her] duty." " 'We review for abuse of discretion the trial court's determination to discharge a juror and order an alternative to serve. [Citation.] If there is any

substantial evidence supporting the trial court's ruling, we will uphold it. [Citation.] We also have stated, however, that a juror's inability to perform as a juror " 'must appear in the record as a demonstrable reality.' " [Citation.]' [Citation.]" (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 [106 Cal.Rptr.2d 313, 21 P.3d 1225].)

After only two hours of deliberation, the foreperson of Diaz's jury sent the trial court a note saying, "A juror refuses to deliberate further. We believe that this violates instruction number 17.41.1. We want further guidance from the court." Commenting that it wanted to find out "whether it is an honest difference of opinion or whether or not there is, in fact, a juror who is not deliberating," the trial judge had the jury foreperson, Juror No. 9, brought into the courtroom. The foreperson said Juror No. 5 was "intimidated by us needing to discuss her opinion and ours and she just feels ganged up on because she is by herself," and that "her position and her attitude is, this is how I feel, and there is nothing to discuss." Although Juror No. 5 had initially participated in deliberations, she subsequently began refusing to discuss anything, saying only, "This is how I feel." "[E]verything was going fine until like the last 10 or 15 minutes when we realized that this is where we all were positioned. . . . [B]ut, when we had the difference, there was no discussing it further. 'This is how I feel.' " "We tried, like, two or three times to encourage her. And everybody calmed down and backed off and just tried to ease the situation and then approach it again, and it was just— that's it." "When the other jurors told her they weren't ganging up on her and not to take it personally, Juror No. 5 said she feels like it is [personal]. She is completely intimidated . . . ."

The trial court indicated it wanted to question Juror No. 5, and counsel did not object. The trial court asked Juror No. 5. if she was having difficulty in the jury room. She said, "I think I am," and began to cry. She said she had been discussing her opinion and the factual basis for it with the other jurors, "[b]ut they are . . . all bombarding me and I am just telling them the way that my belief—." Pointing out that deliberations had only been going on for about two hours (after a two-week trial), the court reminded her to "decide the case for yourself, but you should do so only after discussing the evidence and the instructions with the other jurors," and that "it is rarely helpful for a juror at the beginning of deliberation to express an emphatic opinion on the case or to announce a determination to stand for a certain verdict."

The trial court then had Juror No. 11 brought into the courtroom. Juror No. 11 said that although Juror No. 5 had initially participated in deliberations, she stopped doing so and now refused to discuss the evidence. When the other jurors asked Juror No. 5 to discuss her position, she refused,

saying: "That's it. I am not going to discuss it any more." She complained the other jurors were "ganging up" on her. The trial court brought in Juror No. 1, who said Juror No. 5 had initially deliberated, but then stopped because she felt the other jurors were attacking her. "The Court: Okay. When you ask her to discuss the case or the facts, what does she say? [¶] Juror No. 1: 'You are all attacking me.' [¶] The Court: Is it your perception that, in fact, Juror No. 5 is being attacked? [¶] Juror No. 1: No. [¶] The Court: Okay. Tell me why not. [¶] Juror No. 1: We have asked that she explain her thoughts and why she feels that way, and perhaps we could then understand the reason why she is feeling the way she is feeling."

The trial court had all the jurors and alternates brought in for a rereading of the instructions relating to juror duties, and then excused them for the day. The next morning, the court indicated it felt further questioning of Juror No. 5 was necessary to determine if she was either refusing to deliberate or incapable of deliberating because she felt intimidated. Juror No. 5 was brought in and the trial court asked: "Yesterday you said you felt intimidated by the other jurors and, in fact, it was something that brought you to tears. [¶] Do you still feel intimidated by the other jurors?" She said, "No, your Honor. I was going through a lot. My brother-in-law was very sick and he died yesterday." She then said, "It has been kind of hard for me, but I am doing better now, your Honor." When the trial court asked if this personal loss wouldn't make it hard for her to deliberate because "[i]t sounded like yesterday that interfered with it," she replied, "Well, I didn't know that he had died until I got home." She said her brother-in-law's illness had been bothering her the day before, but when the trial court asked if she thought that was why she had been having problems in the jury room, she said: "No. There was a lot of problems in there. But, I think I can do my job, your Honor. [¶] The Court: Okay. What has changed to make you think so? [¶] Juror No. 5: I made up my mind that I am a juror and I have to do my job and, like you told me, weigh the evidence, and I am going to do my job." Asked if her brother-in-law's death wouldn't affect her, she said: "No, your Honor, because he is not suffering anymore. He was suffering a lot; he had bilateral kidney failure and he was on the machine. So he is not suffering any more." When the trial court asked what had changed since the day before to make her feel she was not going to be intimidated anymore, Juror No. 5 replied: "Because I have got a lot of prayer and I know the Lord will bring me through. Your Honor, that's how I feel. That's my belief."

The trial court indicated to counsel it felt that Juror No. 5's answers had raised questions about her "candor and reliability" because, during the previous day's questioning, she hadn't said anything about her brother-in-law's illness. "She said she was intimidated by the others. And she said that

in that case she hadn't discussed the case with [the] others, and yesterday she said nothing about the fact that her brother-in-law was near death and that was prohibiting her from being able to make a determination in regards to this case—" "[I]t almost seems to me that there is good cause on just a number of levels. First of all, the juror has lied about what was a problem for her. First she said it was intimidating, and then she says she is emotionally upset because her brother-in-law was near death. Then she finds out overnight that he has, in fact, passed away. And I question whether or not that death . . . isn't going to continue to interfere with her ability to make decisions in this case, in light of what happened yesterday, and how she wasn't forthcoming." The trial court noted the three jurors examined had all "indicated that [Juror No. 5] did fail to perform her duty to deliberate. All of the jurors indicated that she talked for a while and then stopped, and refused to talk anymore with the other jurors." The trial court concluded: "I have had an opportunity to observe all . . . four jurors that I have made inquiry of and see their facial expressions, the tone and manner of the way that they discussed things. And it's my call that I think that Juror No. 5 is emotionally distraught and couldn't say it yesterday, and still looked emotionally distraught today, and I find it difficult that she didn't fully disclose, and I do find there is good cause under those three situations: failure to deliberate, the fact of feeling intimidated, and also the fact that apparently her mind wanders and makes her recalcitrant to deliberate when she feels someone is in ill health by her admission today. [¶] So, . . . I am going to determine that there is good cause to excuse Juror No. 5."

Responding to a subsequent new trial motion, the trial court amplified its explanation. The court noted that all three of the other jurors examined agreed "that after a relatively short period, be it an hour or two hours, after a 10-day trial, that [Juror No. 5] was no longer taking part in the decisions— or discussing the facts of [the] case. [¶] And when she was first confronted with that decision, she said that she was deliberating, although she felt intimidated, and that she was trying to do that. But the next day she basically comes in and contradicts her story and says that . . . the difficulty in her deliberations yesterday [was] due to the fact that she was upset, and understandably so, at the life-threatening illness that she had been worried about with her brother-in-law. [¶] And so, that wasn't disclosed the first day . . . ." "[B]asically my decision was made on the failure to deliberate, failure to be honest about what was taking place, her feeling intimidated, and the difficulties that one would reasonably have as a result of that."

Refusal to deliberate constitutes good cause for removal. "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow

jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors, and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge." (*People v. Cleveland, supra,* 25 Cal.4th at p. 485.) "[W]e adhere to the established California law authorizing a trial court, if put on notice that a juror is not participating in deliberations, to conduct 'whatever inquiry is reasonably necessary to determine' whether such grounds exist [citation] and to discharge the juror if it appears as a 'demonstrable reality' that the juror is unable or unwilling to deliberate. [Citations.]" (*Id.* at p. 484.) In addition, both trial-related and non-trial-related stress can provide good cause for discharging a juror. (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1099-1100 [31 Cal.Rptr.2d 321, 875 P.2d 36] [anxiety about new job]; *People v. Collins* (1976) 17 Cal.3d 687, 696 [131 Cal.Rptr. 782, 552 P.2d 742] [juror said she could not decide case "on the evidence and the law since she was involved emotionally more than intellectually," "that she could not follow the court's instructions, [and] that she had been upset throughout the trial"]; *People v. Warren* (1986) 176 Cal.App.3d 324, 326-327 [221 Cal.Rptr. 768] [juror said she was so intimidated by other jurors she was likely to vote with majority and against her own conscience]; see also *In re Mendes* (1979) 23 Cal.3d 847, 852 [153 Cal.Rptr. 831, 592 P.2d 318] [trial court properly granted juror's pretrial request to be excused on assumption her "normal grief" over brother's sudden death "would make it exceedingly difficult for [her] to concentrate"].)

Diaz argues Juror No. 5 was not refusing to deliberate, but that—having properly deliberated and reached a decision—she was simply holding out against a guilty verdict. Diaz argues that in these circumstances the removal of Juror No. 5 was improper under *People v. Castorena* (1996) 47 Cal.App.4th 1051 [55 Cal.Rptr.2d 151]. However, there is little similarity between the two cases. The trial court in *Castorena* never questioned the removed juror, even after she wrote a letter alleging she had been properly deliberating and that the misconduct had been perpetrated by a different juror. *Castorena* held it had been an abuse of discretion to remove this juror because, without inquiring into her allegations, the trial court "did not have the requisite facts upon which to decide whether [the removed juror had] in fact failed to carry out her duty as a juror to deliberate or whether the jury's inability to reach a verdict was due, instead, simply to [the removed juror's] legitimate disagreement with the other jurors." (*Id.* at p. 1066.) Here, the trial court did inquire into the alleged misconduct before acting. The *Castorena* jury had already

been deliberating for *days* when the issue of juror misconduct arose, whereas Diaz's jury had been deliberating for at most *two hours*. Moreover, Juror No. 5's own statement to the trial court the second time she was examined—when she said, "I made up my mind that I am a juror and I have to do my job and . . . weigh the evidence, and I am going to do my job"—demonstrates she had not been deliberating the day before and, therefore, that she could not have been a legitimate holdout juror.

Diaz also relies on *People v. Delamora* (1996) 48 Cal.App.4th 1850 [56 Cal.Rptr.2d 382], where the trial court removed two jurors who had expressed concerns about not being compensated by their employers if they spent too much time on jury duty. The Court of Appeal found an abuse of discretion, not because problems relating to a juror's employment may not provide a basis for a proper discharge, but because it was unclear whether there was actually such a problem in the case. The trial court had removed the two jurors—after they had been deliberating for more than three days—without first asking if they were willing to deliberate longer even if their employers would not pay them. "Although a trial court does not abuse its discretion when it discharges a juror because of problems related to the juror's employment, the employment problem must be real and not imagined." (*Id.* at p. 1855.) *Delamora* is inapposite because Juror No. 5 was not discharged until after the trial court questioned her.

Juror No. 5's demeanor and responses when initially questioned by the trial court revealed that she was extremely upset. Her responses to the next day's follow-up questioning demonstrated that her distress had caused her to stop deliberating, and revealed a troubling equivocation as to why she had been distressed. The trial court was entitled to discount Juror No. 5's verbal declarations when they conflicted with her demeanor. (See *People v. Lucas* (1995) 12 Cal.4th 415, 489 [48 Cal.Rptr.2d 525, 907 P.2d 373] ["Although the juror stated the cancellation of her vacation would not affect the discharge of her duties as a juror, her behavior and demeanor supplied substantial evidence to the contrary. She had repeatedly brought the problem of the vacation to the court's attention, exhibiting concern and agitation over it. The court determined that the juror's demeanor indicated her ability to deliberate fairly would be substantially impaired if the penalty trial caused her to cancel her vacation."]; *People v. Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153] [recognizing importance of trial court's observation of juror's demeanor in reviewing decision to discharge]; *People v. Halsey* (1993) 12 Cal.App.4th 885, 892 [16 Cal.Rptr.2d 47] [trial court properly removed juror because his evasions under questioning led court to conclude he had violated order not to discuss case and lacked ability to follow instructions, keep open mind, and be objective].)

Finally, we cannot agree with Diaz that the recent *Cleveland* decision demonstrates the trial court erred. In *Cleveland*, the record failed to establish

a refusal to deliberate as a demonstrable reality because "it became apparent under questioning that the juror simply viewed the evidence differently from the way the rest of the jury viewed it." (*People v. Cleveland, supra,* 25 Cal.4th at p. 486.) "It is possible that Juror No. 1 employed faulty logic and reached an 'incorrect' result, but it cannot properly be said that he refused to deliberate. Juror No. 1 participated in deliberations, attempting to explain, however inarticulately, the basis for his conclusion that the evidence was insufficient to prove an attempted robbery, and he listened, even if less than sympathetically, to the contrary views of his fellow jurors. [¶] Under these circumstances, we conclude that the trial court abused its discretion in excusing Juror No. 1." (*Ibid.*)

Here, on the other hand, the initial questioning of Juror No. 5 revealed that she might indeed be refusing to deliberate because she felt intimidated by the other jurors, even though she insisted she had been deliberating properly. When the trial court examined her the next day, however, Juror No. 5 gave several different stories. First she seemed to blame her emotional distress the day before on her brother-in-law's death. Then she conceded it hadn't been the death which upset her (because she didn't learn of it until that night), but that it had been her brother-in-law's illness. Based on its observation of Juror No. 5's demeanor, the trial court concluded she had not been truthful the day before and that her ability to deliberate was being inhibited by something (either emotional upset caused by her brother-in-law's illness, or intimidation by the other jurors, or a combination of both). And as noted above, Juror No. 5's own statements revealed that she had simply stopped deliberating on the first day. Thus, substantial evidence exists to support the trial court's conclusion that Juror No. 5 was not merely viewing the evidence differently from the other jurors; rather, she was having problems deliberating and she had not been candid about it. In these circumstances, the trial court did not abuse its discretion by discharging her.[2]

### 2. *Unavailable witness.*

■ Diaz contends the trial court erred by admitting Martha S.'s preliminary hearing testimony under Evidence Code section 1291 (former testimony of unavailable witness) because the prosecution failed to show diligent efforts had been made to secure her attendance at trial. This claim is meritless.

■ Under Evidence Code section 240, subdivision (a)(3), a person is "unavailable as a witness" within the meaning of Evidence Code section

---

[2]We also hold the trial court did not err by denying Diaz's new trial motion based on the claim Juror No. 5 had been improperly discharged.

1291 if she is absent and the proponent of her statement, although exercising due diligence, has been unable to secure her attendance at trial. The proponent of the evidence has the burden of establishing unavailability. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1297 [18 Cal.Rptr.2d 796, 850 P.2d 1].) An appellate court "will not reverse a trial court's determination [under § 240] simply because the defendant can conceive of some further step or avenue left unexplored by the prosecution. Where the record reveals, . . . that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually, as here, with the benefit of hindsight) does not automatically render the prosecution's efforts 'unreasonable.' [Citations.] The law requires only reasonable efforts, not prescient perfection." (*People v. McElroy* (1989) 208 Cal.App.3d 1415, 1428 [256 Cal.Rptr. 853], disapproved on other grounds by *People v. Cromer* (2001) 24 Cal.4th 889, 900, fn. 3 [103 Cal.Rptr.2d 23, 15 P.3d 243].) "That additional efforts might have been made or other lines of inquiry pursued does not affect [a] conclusion [there was due diligence] . . . . It is enough that the People used reasonable efforts to locate the witness." (*People v. Cummings, supra*, 4 Cal.4th at p. 1298.) A court cannot "properly impose upon the People an obligation to keep 'periodic tabs' on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive. Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply 'disappear,' long before a trial date is set." (*People v. Hovey* (1988) 44 Cal.3d 543, 564 [244 Cal.Rptr. 121, 749 P.2d 776].)

The Supreme Court has recently resolved the proper appellate standard of review for this issue, ruling that it is independent review. (*People v. Cromer, supra,* 24 Cal.4th at pp. 892-893 [in "evaluating a trial court's due diligence determination" the appellate court's "proper standard is independent, de novo, review rather than the more deferential abuse of discretion test"].) ■ Under this standard of review, the trial court properly admitted Martha's preliminary hearing testimony. Diaz argues the police took a calculated risk Martha would be unavailable for trial when they did not try to subpoena her until just before the trial started, and that the prosecution should, therefore, have been charged with the consequences. However, we conclude not only that the prosecution demonstrated due diligence in trying to secure her presence at trial, but also that it is fairly clear Martha purposely made herself unavailable because she was unwilling to testify.

At the due diligence hearing, Officer Jose Ramirez testified he made more than five attempts to personally serve Martha with the subpoena at the beginning of the trial. He spoke to her mother, who said she had no information. He went to schools Martha had attended, but he got no leads.

He asked patrol officers on all three shifts to look for Martha, but they were unable to find her. In his presence, the victim made telephone calls to Martha's mother and brother. According to the brother, Martha knew the police were looking for her and she was determined not to testify. Ramirez checked with local hospitals and the Department of Motor Vehicles. He checked to see if Martha had been arrested recently.

Detective William Eagleson was one of the investigating officers. He testified that on September 23, 1998, he picked Martha up at her mother's house (where she was living), falsely told her he wanted to talk to her at the police station, and instead took her to the courthouse to testify at the preliminary hearing. Eagleson said this was the only way he could have gotten her to come to court. Martha had told him she didn't want to testify. She was very fearful because this was a gang case and her brothers were well-known members of the Clover Gang. Eagleson testified he knew Martha would be staying at her mother's house after the preliminary hearing because Martha was pregnant. Eagleson had extensive experience in gang-related investigations. In his professional opinion, serving a subpoena on Martha well in advance of trial would have only ensured her unavailability. After the preliminary hearing, Eagleson monitored Martha's whereabouts on a weekly basis. He knew the area where she lived and he talked to people there who said Martha was still living with her mother. Eagleson himself occasionally saw Martha around the neighborhood. Based on his general experience in gang cases, and on his specific experience with Martha, Eagleson's tactic would have been to subpoena her at the same time that he actually went to pick her up to bring her to court to testify. Giving Martha advance warning would merely ensure that she would leave the area that day to avoid testifying.

In light of this testimony, we agree with the trial court's conclusion that, "given the particular circumstances of this case, . . . the witness is actually making a calculated effort to avoid service of process. And therefore, the detective's decision to—how he decided to serve the subpoena, if he could have, certainly appears reasonable under the circumstances, given his personal knowledge of the witness. [¶] So, given my best judgment and reasoning, . . . under the totality of the circumstances, it does appear . . . that due diligence has been made." There was no error in admitting Martha's preliminary hearing testimony.[3]

---

[3]We also conclude the trial court did not err by denying Diaz's new trial motion, alleging newly discovered evidence, based on testimony from Martha S. that she was available for trial and would have testified Diaz was not the gunman. The trial court reasonably concluded Martha's new testimony was cumulative because it replicated her preliminary hearing

### 3. *Section 654 violation.*

█ Diaz contends the trial court erred by not staying the sentences on counts 2, 3 and 4. This claim has merit.

The trial court sentenced Diaz to state prison for 37 years to life on his conviction for attempted murder under count 1 of the information. The trial court also sentenced him to 25 years to life on the aggravated mayhem conviction under count 2; six years on the aggravated assault conviction under count 3; and seven years on the aggravated assault conviction under count 4. The trial court then ordered the sentences on counts 2, 3 and 4 to run concurrently with the sentence on count 1.

Diaz argues, and the Attorney General concedes, that the concurrent sentences on counts 2, 3 and 4 should have been stayed pursuant to section 654 because those counts all involved charges based on the same single act of shooting a single victim.

We agree. Diaz's concurrent prison sentence on counts 2, 3 and 4 must be stayed so long as the judgment on count 1 remains in full force and effect. (See *People v. Robinson* (1991) 226 Cal.App.3d 1581, 1587 [277 Cal.Rptr. 504]; *People v. Mulqueen* (1970) 9 Cal.App.3d 532, 547-548 [88 Cal.Rptr. 235].)

#### DISPOSITION

The concurrent sentences on counts 2, 3 and 4 are hereby ordered stayed. As modified, the judgment is affirmed.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied February 22, 2002, and appellant's petition for review by the Supreme Court was denied April 17, 2002.

---

testimony, during which she refused to identify Diaz and did her best to disavow the statements she had made to police at the time of the shooting identifying him as the gunman.