Filed 2/6/14  P. v. Landix CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>IMMACULATA LANDIX,<br><br>    Defendant and Appellant. | B244916<br><br>(Los Angeles County<br> Super. Ct. No. BA339351) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge.  Affirmed.

Jennifer M. Hansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Immaculata Landix of arson of an inhabited structure (Pen. Code, § 451, subd. (b)).[1]  The trial court found that she had two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), two serious prior felony convictions (§ 667, subd. (a)(1)), and had served a prior prison term (§ 667.5, subd. (b)).  The court sentenced her to 25 years to life under the Three Strikes law, plus consecutive terms of 10 years each for the prior serious felony convictions.  The court struck the prior prison term.

Defendant appeals from the judgment of conviction, contending that the trial court erred by:  (1) admitting the preliminary hearing testimony of Joseph Mouton, defendant's husband who witnessed defendant start the fire resulting in her arson conviction; (2) admitting evidence that defendant had a prior fight with a woman she thought was having an affair with Mouton; and (3) denying defendant's motion to strike her prior strike convictions.  We reject these claims and affirm the judgment.

## BACKGROUND

*Prosecution Evidence*

In the early morning hours of April 18, 2008, defendant started a fire in the rented room she shared with her husband, Joseph Mouton, in a house on 81st Street in Los Angeles.  The fire quickly grew out of control, and damaged the entire house.

The house was owned by Elisha Ticer, who lived there with her 18-year-old son.  Before the fire, defendant knocked on Ticer's door and asked her to tell Mouton to give her the remote control.  Thinking the request odd, Ticer refused.

---

[1]     Undesignated section references are to the Penal Code.

Defendant said, "Okay. Thank you, Ma'am," and left. About or 15 minutes later, Ticer heard the smoke alarm.

According to Mouton,[2] around 1:30 a.m., defendant woke him up and was very angry. She grabbed a bag that held Mouton's CD's, and threatened to sell them. Mouton took back the bag and went to bed. Defendant then tried to play music on a DVD player. Mouton told her it was too late, and grabbed the wires so that defendant could not use the player. Using a lighter, defendant then set fire to the bottom and top of curtains that covered the closet in the bedroom. The fire grew quickly and the heat was intense. Mouton grabbed his CD's and fled from the house.

Having heard the smoke alarm, Ticer walked toward the kitchen, and saw defendant with a pitcher of water in her hand. Defendant said that there was a "small issue." After seeing smoke, Ticer pressed the fire alarm, and went outside with her son to wait for the fire department.

Firefighters responded and extinguished the fire. Los Angeles Fire Department Battalion Chief Antoine McKnight observed heavy charring in defendant's bedroom, and determined that the fire started there. He spoke to defendant, who told him that she had started the fire.

Los Angeles Fire Department Arson Investigator Michael Neu determined that the fire started in the back bedroom and damaged the entire house. There was extensive fire damage to the closet and the ceiling above the closet. Neu spoke to defendant, who was across the street from the house. Defendant repeatedly told Neu that she started the fire by lighting the curtains on fire, and apologized. While

---

[2]     Mouton was unavailable to testify at trial, and his preliminary hearing testimony was read to the jury. It was stipulated that he had previously been convicted of one count each of felony and misdemeanor spousal abuse.

speaking with Neu, defendant was looking angrily at Mouton. Neu arrested defendant, searched her, and found a lighter in her pocket. Defendant said that she used the lighter to set the curtains on fire.

Los Angeles Police Officer David Tello took custody of defendant. Besides telling Officer Tello that she started the fire, defendant repeatedly complained to him that her husband was having an affair. According to Ticer, about a month before the fire, defendant accused a woman who was then living in the house of "messing" with her husband. The two women got into a fight, which Ticer broke up.

*Defense Evidence*

According to Neu, Ticer told him that defendant ran down the hall yelling that the house was on fire, and attempted to extinguish the fire with several pitchers of water.

**DISCUSSION**

I. *Admission of Moulton's Preliminary Hearing Testimony*

Defendant contends that Joseph Mouton's preliminary hearing testimony was inadmissible, because the prosecution failed to prove that he was unavailable at trial. We disagree.

*Evidence Code Section 402 Hearing*

The charged arson occurred in April 2008. At the preliminary hearing in September 2008, Mouton testified and defendant was held to answer. However, in January 2009, the trial court found defendant to be incompetent to stand trial (§ 1368), suspended criminal proceedings, and placed her in the custody of the

4

Department of Mental Health. Defendant did not return to court until August 2010, at which time the court found her competent to stand trial. Thereafter, the case was repeatedly continued at defense request and by stipulation of counsel. It finally came to trial with the swearing of the jury on April 23, 2012.

Meanwhile, on April 19, 2012, in a break during jury selection, the court began an Evidence Code section 402 hearing regarding the unavailability of Mouton for trial. The hearing concluded on April 23. The witnesses at the hearing were Arson Investigator Michael Neu and District Attorney Investigator Linnear Lawless.

According to Neu, in 2008 he served several subpoenas on Mouton for the preliminary hearing, and drove him to court several times. After testifying at the preliminary hearing, Mouton said that he would not testify against defendant again.

On October 10, 2010, Neu left a voicemail on Mouton's cell phone telling him that there was a court date and he needed to testify. He left several more messages the next day, but Mouton never returned the calls. However, on December 2, 2011, Mouton answered his cell phone when Neu called. He said that he was in Louisiana because of a death in his family and would be returning to California at the beginning of 2012.

Neu left messages for Mouton to call back on March 7, March 30, April 10, and April 17, 2012. Mouton finally called back on April 18, 2012, the day before the hearing on his unavailability. Mouton said that he was in Texas and would remain there until May or June. He said that he was not going to testify against his wife and had moved on with his life.

Neu never knew Mouton's address, and Mouton would not provide it. He did not subpoena Mouton's cell phone records to learn his location. However, he occasionally looked for Mouton in the area of Vermont and Manchester, where

Mouton was known to hang out. He checked the area about three weeks before the hearing, but did not find him.

On April 19, 2012, Mouton called Neu twice and left messages asking how the court hearing went. Neu called back, and spoke to Mouton, who said that he was in Austin, Texas, and would not be back until June. When he did return, he intended to be with "her," which Neu took to mean defendant. Mouton refused to return and testify against defendant.

According to Investigator Lawless, she attempted to locate Mouton beginning on March 22, 2012, to serve him with a subpoena for a March 29 court date. Through the DMV, she found an address on South Normandie, which turned out to be a liquor store with a P.O. Box. Lawless went there and spoke to the store clerk, who said that Mouton had picked up his mail the day before, but that Mouton was rarely there. Mouton had told the clerk that he had bought a mobile home and was living in Norwalk. Lawson left a copy of the subpoena and her card in Mouton's P.O. Box.

The next court date was April 18, 2012. On April 13, 2012, Lawless called Mouton's cell phone and left him a message. Mouton called back a few minutes later four successive times, but they had difficulty making a connection. Lawless could hear him on one occasion telling someone in the background that he was calling someone in California. Finally Lawless was able to speak to him. She identified herself as a District Attorney Investigator and told Mouton that he had a court date coming up. Mouton sounded agitated. He said that he was out of town visiting family, that he would back on April 27th, and he would then appear in court. She asked if he could come sooner, and he said no.

Following that conversation, Lawless learned of an address for Mouton in Glendale listed on a warrant issued the prior October. On April 16, 2012, she went

6

to the address and spoke to a tenant and the apartment manager. She learned that Mouton used to live in an apartment there, but had moved out a year earlier.

After she learned that Mouton had spoken to Neu and said he was in Texas and would not testify, Lawless went to an address on 89th Street in Los Angeles that Mouton had given the last time he was arrested. The house was vacant. She then went to the liquor store where Mouton's P.O. Box was located, but the business was closed. She searched for additional addresses through the Department of Justice, Sheriff's Department, the Coroner, and DMV. She found no additional addresses. Mouton was not on probation. She also attempted to contact a woman whom Mouton had once listed as an emergency contact. Lawless called the number and left a message, but never made contact.

Citing *People v. Herrera* (2010) 49 Cal.4th 613 (*Herrera*), the court concluded that the prosecution had exercised due diligence in attempting to secure Mouton's presence at trial. In short, the court found that the prosecution had consistently kept in contact with Mouton, even though he did not want to be found and come to court, but that, despite such diligence, the prosecution did not have a reasonable means to serve Mouton with a subpoena because he could not be located.

*Analysis*

Under the confrontation clause of the Sixth Amendment to the United States Constitution, a criminal defendant has the right to confront the prosecution's witnesses. An exception to the confrontation requirement is where a witness is "unavailable" and has given testimony at previous judicial proceedings against the same defendant and was subject to cross-examination. (*Herrera, supra,* 49 Cal.4th at p. 621.) A witness is considered unavailable for purposes of the Sixth

Amendment when the prosecution has made a good-faith effort to secure his presence at trial. (*Ohio v. Roberts* (1980) 448 U.S. 56, 74, overruled on other grounds by *Crawford v. Washington* (2004) 541 U.S. 36.) Similarly, Evidence Code section 240 provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) "The constitutional and statutory requirements are 'in harmony.'" (*People v. Smith* (2003) 30 Cal.4th 581, 609, quoting *People v. Enriquez* (1977) 19 Cal.3d 221, 235.) The touchstone of both is the reasonableness of the efforts *actually made* by the prosecution, even though "additional efforts might have been made or other lines of inquiry pursued. . . . It is enough that the People used reasonable efforts to locate the witness." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298.) We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard, and independently review whether the facts demonstrate prosecutorial good faith and reasonable or due diligence. (*Herrera, supra,* 49 Cal.4th at p. 623.)

Here, after the September 2008 preliminary hearing, at which Mouton again made clear he did not want to testify, there was a substantial delay in the progress of criminal proceedings during the period of defendant's incompetence to stand trial. After criminal proceedings resumed in August 2010, the prosecution made more-than-reasonable efforts to locate Mouton and subpoena him for court. Beginning in October 2010, Neu left numerous messages for Mouton to call. Mouton finally answered a call on December 2, 2011, but said he was in Louisiana and would not be returning until early 2012.

On March 7, March 30, April 10, and April 17, 2012, Neu left messages for Mouton. He finally called back on April 18, 2012, said that he was in Texas,

would remain there until May or June, and would not testify against his wife.  On April 19, 2012,  Neu spoke to Mouton again by phone.  Mouton reiterated that he was in Texas (specifying Austin),would not be back until June, and would not testify against defendant.  When he did return, he intended to be with "her."

Neu never knew Mouton's address, and Mouton would not provide it.  He occasionally looked for Mouton in the area of Vermont and Manchester, where Mouton was known to hang out,  but did not find him.

Investigator Lawless made additional attempts to locate Mouton beginning March 22, 2012.  Learning through the DMV of a prior address for Mouton on South Normandie – a P.O. Box in a liquor store – Lawless learned that Mouton had been there the day before, but was rarely there and had said he was living in a mobile home in Norwalk.  She left her card and a subpoena in defendant's P.O. Box.  On April 13, 2012, Lawless made phone contact with Mouton, who sounded agitated and\, said that he was out of town visiting family, would be back on April 27th, and would then appear in court.  As we have already discussed, he later told Neu that he would not return and testify.

Without success, Lawless went to an address for Mouton in Glendale listed on a warrant issued the prior October, and to an address on 89th Street Mouton had given when he was last arrested.  She returned to the liquor store where Mouton's P.O. Box was located, but the business was closed.  She searched for additional addresses through the Department of Justice, Sheriff's Department, the Coroner, and DMV, with no luck.  She also unsuccessfully attempted to contact a woman whom Mouton had once listed as an emergency contact.

These efforts can only be characterized as timely and diligent in exploring Mouton's possible location and in seeking to obtain his presence at trial.  Moreover, although Mouton was an important witness, he was not crucial.

9

Defendant repeatedly confessed to setting the fire, and never suggested that she did so accidently. (See *Herrera, supra,* 49 Cal.4th at p. 622 [relevant factors include timeliness of efforts, importance of the witness, and whether witness' possible location was competently explored].) We conclude that the trial court did not err in finding that the prosecution exercised due diligence.

Contending that the prosecution could not show due diligence without completely ruling out the possibility that it could subpoena Mouton from out of state using the Uniform Act to Secure the Attendance of Witnesses from Without the State in Criminal Cases (§ 1334, et seq.), defendant argues that to show due diligence, the prosecution was compelled to: (1) subpoena Mouton's cell phone records in an attempt triangulate his location using cell towers in Texas, and (2) determine whether Mouton's cell phone had Global Positioning System (GPS) capability, and if so, use GPS to pinpoint his location. We disagree that such extraordinary measures were required. As we have noted, the focus of the due diligence inquiry is on whether the efforts *actually made* were reasonable. "An appellate court 'will not reverse a trial court's determination [under § 240] simply because the defendant can conceive of some further step or avenue left unexplored by the prosecution. Where the record reveals, . . . that sustained and substantial good faith efforts were undertaken, the defendant's ability to suggest additional steps (usually, as here, with the benefit of hindsight) does not automatically render the prosecution's efforts "unreasonable." [Citations.] The law requires only reasonable efforts, not prescient perfection.'" (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

Defendant also contends that because Investigator Neu did not specifically ask for Mouton's address in Texas, the prosecution's efforts were less than diligent. However, according to Neu, defendant "would never tell me where [he

10

lived], even in Los Angeles." Moreover, Mouton made it clear to Neu that he did not intend to testify. Obviously, given the near certainty that Mouton would decline to tell Neu his location in Texas, Neu's failure to ask did not vitiate the reasonable diligence of the prosecution's efforts in trying to locate him.

II. *Evidence of Defendant's Altercation with a Prior Tenant*

Defendant contends that that the trial court erred in admitting Ticer's testimony concerning defendant's altercation with a former female tenant. We find no error.

Outside the presence of the jury, before Ticer took the stand, the prosecutor stated that she had just interviewed Ticer and had learned some new relevant information. Ticer said that perhaps a month before the fire, defendant was very angry with Mouton, and accused a former female tenant of having an affair with him. The two women had gotten into an altercation, which Ticer broke up. The prosecutor argued that, in combination with Officer Tello's expected testimony that defendant repeatedly confessed to the starting the fire and complained that her husband had had an affair, Ticer's new evidence was relevant to show a motive for setting the fire: anger at Mouton for having an affair.

Defense counsel objected to the evidence under Evidence Code section 352, arguing that it was not relevant because the incident, having occurred a month before the fire, did not reasonably relate to the starting of the fire. Further, the evidence had only now been disclosed. The trial court overruled the objection, concluding that the evidence was relevant to disprove the defense theory that defendant started the fire by accident.

Thereafter, Ticer testified that about a month before the fire, she saw defendant and a former female tenant "arguing back and forth and . . . somebody

11

hit somebody." Ticer separated them, and defendant said that the other woman was "trying to mess with [my] husband," and defendant "didn't like her talking to her husband, messing with her husband or something like that." Further, Officer Tello testified that when he took custody of defendant, she was talking in a rambling fashion, and repeatedly complained, perhaps a hundred times, that her husband had had an affair, and also said that she had started the fire.

We review the trial court's ruling for abuse of discretion (*People v. Cole* (2004) 33 Cal.4th 1158, 1198), and find no error. Under Evidence Code section 352, the court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Here, from Officer Tello's testimony, the jury could reasonably infer that on the morning of the fire, defendant was obsessed with the idea that Mouton had had an affair, and that the defendant's dispute with Mouton immediately before the fire was less about defendant's desire to play music than it was about her belief that he had been unfaithful. Ticer's testimony helped explain defendant's anger: only a month before the fire, defendant had fought with a woman who she believed had been "messing" with Mouton. Ticer's testimony was thus plainly relevant to prove that defendant, obsessed with the idea that Mouton had been unfaithful, and angry over a dispute about playing music, intentionally set the fire as a way of punishing Mouton and expressing her outrage. Ticer's testimony on the subject was short, and there was no substantial danger of undue prejudice or confusing the jury. Thus, the trial court did not abuse its discretion in admitting the evidence.

12

III. *Denial of Defendant's Motion to Strike*

Defendant contends that the trial court erred in denying her motion to strike one or both of her prior strike convictions. We find no abuse of discretion.

Defendant's first criminal conviction was in 1980 for petty theft (§ 484). Thereafter, she was convicted of her two strikes, both for felony assault with a deadly weapon (§ 245, subd. (a)(1)) in 1983 and 1994, respectively. In the first case, she stabbed a friend in the back twice with a knife after the friend refused her demand for money. She received probation and a year in county jail. In the second case, the victim (as in the present case) was Joseph Mouton, whom defendant struck in the face with a bottle after he refused to buy her cocaine. Defendant was sentenced to two years in state prison, and paroled in January 1997.

After her release in 1997, she was convicted of three misdemeanors in separate cases that year: disturbing the peace (§ 415), assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), and battery (§ 242). In 2000, defendant was convicted of felony assault by means of force likely to produce great bodily injury (a non- strike). In the incident, she attacked the victim for talking with her husband (apparently Mouton), striking her repeatedly in the head with her fists. Defendant was sentenced to four years in state prison, and was later convicted of misdemeanor possession of a dirk or dagger (§ 12022, subd. (a)(4)). She was paroled in July 2005, and committed the arson involved in this case less than three years later, in April 2008. That crime is also a strike offense. (§ 667.5, subd. (c)(10).)

In her motion to strike her prior strike convictions before sentencing, defendant's counsel noted defendant's age (55), her declining physical health, and the age of defendant's prior strikes (occurring in 1983 and 1994). She also argued that defendant's commission of the instant arson was mitigated because she tried to

13

put out the fire, warned the occupants of the house (all of whom escaped), confessed, and apologized for the crime. Based on interviews with defendant's family members and her review of defendant's psychiatric records, counsel stated defendant was the product of rape, began taking psychiatric medications as a child, became sexually active around age 12, and learned of her first pregnancy during a psychiatric hospitalization at Metropolitan State Hospital. After her release, she tried to kill herself. She was again hospitalized, and gave birth to her first child. Thereafter, she made other suicide attempts, complained of hearing voices, and was hospitalized on subsequent occasions. Defense counsel also included statements by some of defendant's relatives regarding domestic abuse by Joseph Mouton.

At the hearing on the motion, defendant's sister addressed the court, and reiterated that defendant was mentally ill and needed rehabilitation, not incarceration. Defendant addressed the court and apologized for setting the fire. She acknowledged that she had a serious mental problem and a serious anger problem. She asked for treatment, and stated that she would not receive it in prison.

In oral argument, defense counsel did not discount defendant's past violence, or the potential danger of the current arson conviction. But she urged the court to consider that much of the prior violence centered around defendant's combustible relationship with Joseph Mouton and was a product of her serious mental illness. Defense counsel asked the court to sentence defendant to something other than a life sentence.

In denying the motion to strike defendant's strike convictions, the trial judge stated: "This is the hardest decision I've made since I've been on the bench in five years." Briefly recounting his background as a criminal defense attorney who

14

represented clients with similar histories, he stated: "So with that background, I have to say that I am extremely sympathetic and extremely understanding of Ms. Landix's background. The problem is . . . that she's got a very sympathetic background but for whatever reason, be it mental health, be it the environment in which she was raised, I don't know, but for whatever reason, her default when she suffers or experiences some kind of disappointment or upset is violence and it has been that way for 30 years." Reviewing defendant's criminal history, and noting the extreme danger of the arson defendant committed in the instant case, the judge determined that despite defendant's personal hardships and mental illness, the need to protect the community outweighed the mitigating factors of her background, and dictated that the court deny the motion to strike the prior strike convictions.

A trial court's refusal to strike a prior conviction allegation is reviewed under the deferential abuse of discretion standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 375 (*Carmony*).) Under that standard, the party seeking reversal must "'clearly show that the sentencing decision was irrational or arbitrary. [Citation.]'" (*People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977.) It is not enough to show that reasonable people might disagree about whether to strike a prior conviction. (*Carmony, supra*, 33 Cal.4th at p. 378.) Only extraordinary circumstances justify a finding that a career criminal is outside the Three Strikes law. (*Ibid*.) Therefore, "the circumstances where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme must be even more extraordinary." (*Ibid*.) When considering whether to strike prior convictions, the relevant factors a court must consider are "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and

15

hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) The Three Strikes law "not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm. . . . [T]he law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*People v. Carmony, supra*, 33 Cal.4th at p. 378; *In re Large* (2007) 41 Cal.4th 538, 550-551.) We presume the trial court considered all the relevant factors in the absence of an affirmative record to the contrary. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

Here, the record shows a considered and insightful exercise of discretion by the trial court. No doubt defendant's personal background (including her age and personal hardships) and her mental illness constituted mitigating factors. But as the trial court implicitly reasoned, such factors were not so extraordinary as to take defendant outside the letter and spirit of the Three Strikes law. Her lengthy, violent criminal record, including the instant offense (which is itself a strike) posed an unreasonable danger to society and showed an inability to conform her behavior to legal norms. At best, it might be suggested that reasonable minds might differ over the appropriateness of a Third Strike sentence for defendant. But it cannot be said that the court's decision was irrational or arbitrary. Thus, the trial court did not abuse its discretion in denying the motion to strike defendant's prior strike convictions.[3]

---

[3] Defendant also contends that her sentence constitutes cruel and unusual punishment under the Eighth Amendment. However, she forfeited the contention by failing to raise it in the trial court. (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1045.) Were we to consider the claim, we would reject it for the same reasons that the denial of her motion to strike her prior strikes was not an abuse of discretion.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.

17