Filed 11/20/14  P. v. Acuna CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B251386 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA399470) |
| v. | |
| DONALD M. ACUNA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Terry A. Bork, Judge.  Affirmed.

Randall Conner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Yun K. Lee and Corey J. Robbins, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \*

Defendant Donald M. Acuna was charged by information with corporal injury to a cohabitant or child's parent (Pen. Code, § 273.5, subd. (a); count 1),[1] possession of a firearm by a felon (§ 29800, subd. (a)(1); count 2), and felony false imprisonment (§ 236; count 3). All counts alleged prior prison terms (§§ 667.5, subd. (b), 1170, subd. (h)(3)), and counts 1 and 3 also included firearm enhancement allegations (§ 12022.5, subd. (a)). The jury convicted defendant as charged on counts 1 and 2, and found him guilty of the lesser included offense of misdemeanor false imprisonment for count 3. The firearm enhancements were found true. Defendant admitted his four prior prison terms for all counts, and a prior domestic violence conviction as to count 1.

On appeal, defendant contends the trial court erred in admitting the preliminary hearing testimony of the victim, Regina V., reasoning the prosecution did not use reasonable diligence to secure her presence at trial. He also asks us to independently review the trial court's in camera *Pitchess*[2] proceedings. We find the prosecution exercised reasonable diligence to secure Regina V.'s testimony, and therefore the trial court did not err in admitting her testimony from the preliminary hearing. We also conclude there was no discoverable information in the police personnel records. We therefore affirm.

## FACTS

The victim, Regina V., did not testify at trial. Instead, the jury heard her August 14, 2012 preliminary hearing testimony, as follows. On June 29, 2012, she was at the apartment where defendant, defendant's mother, and defendant's brother lived. She and defendant had a two-month-old child together. They had been romantically involved for less than a year. Regina V. did not want to testify against defendant.

On June 29, 2012, the police arrived at the apartment. Regina V. denied calling the police, and denied calling her friend Kelliann Stephenson to ask for help. Before

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

2

police arrived, Regina V. and defendant were getting ready to leave to "do some stuff for [their] baby, because she was coming home." Regina V. denied that defendant yelled at her, or that the two of them fought that day. Regina V. admitted that she had many bruises on her body and arms, claiming she had been involved in a fight with someone else.

Regina V. denied telling responding officers she lived with defendant, or that she was involved in a fight with defendant that day, or that defendant had a handgun and would not allow her to leave the apartment. Regina V. admitted telling officers she and defendant had been involved in a verbal dispute at a Shell gas station three days earlier, on June 26, 2012. She denied telling officers that during the June 26 fight, defendant had hit her multiple times with a handgun. When shown pictures of her badly bruised arms, Regina V. denied telling officers the bruises were caused by defendant on June 26.

On cross-examination, Regina V. testified that on June 29, she told responding officers she and defendant had a small argument that day. Defendant never brandished a handgun, and he did not prevent her from leaving the apartment. Regina V. did not call Ms. Stephenson on June 29. Instead, Ms. Stephenson called her. Ms. Stephenson must have overheard Regina V. "getting loud" with defendant. Regina V. hung up on Ms. Stephenson because she was busy talking to defendant. Regina V. did not ask Ms. Stephenson to call police, and never told Ms. Stephenson she was afraid or needed help.

Regina V. was yelling at defendant because it was time for them to leave but he was still asleep. The bruises on Regina V.'s arms were from a fight with her mother. Regina V. admitted she was high on methamphetamine on both June 26 and June 29. She used methamphetamine on a daily basis.

Ms. Stephenson's 911 call was played for the jury. Ms. Stephenson called 911 on June 29 at 2:09 p.m., reporting that Regina V. had called her "all scared" and "hysterical." Regina V. told Ms. Stephenson she was being held by defendant, at

3

gunpoint. Ms. Stephenson described to the 911 operator the location of the apartment where Regina V. was being held, based on information she received in text messages.

Los Angeles Police Officer Ruben Cardenas testified that he responded to the location Ms. Stephenson described in her 911 call and found defendant, Regina V., defendant's mother, and defendant's brother present at the scene. Regina V. had bruised arms. She appeared "fearful" and "visibly scared." Regina V. avoided eye contact and said she was afraid. When she was interviewed by responding officers Gorgino Medina and Herrera, Regina V. told them she had dated defendant for "some time" and that they lived together. The couple had a two-month-old baby together. Regina V. told officers that she and defendant had a "heated" argument that escalated to the point where defendant, who was armed with a handgun, would not allow Regina V. to leave the apartment. Regina V. wanted to leave, and was scared; she called her friend, Ms. Stephenson, who in turn called police.

Regina V. also told responding officers about another incident on June 26, at a Shell gas station, where defendant struck her numerous times with a handgun. When asked about the bruises on her arms, Regina V. did not specify when she received those bruises. It did not appear to Officer Cardenas that Regina V. was under the influence of any substance.

A handgun was recovered from one of the bedrooms in the apartment; it was a loaded 0.38-caliber revolver that was hidden behind a mattress.

Officer Medina also testified that he was present at the scene and that Regina V. was fearful and reluctant to provide information to police. Eventually, Regina V. admitted she had argued with defendant, and that he was armed with a handgun and would not let her leave the apartment. Regina V. called her friend for help. Regina V. also admitted that three days earlier, she and defendant argued at a gas station, and defendant hit her arms with a handgun.

Ms. Stephenson later arrived at the scene. According to Officer Medina, Ms. Stephenson identified defendant as Regina V.'s boyfriend. Ms. Stephenson told

Officer Medina that Regina V. called her because she and defendant were in an argument, and Regina V. was scared. Regina V. asked Ms. Stephenson to call police because defendant had a gun. Ms. Stephenson could hear defendant screaming in the background when Regina V. called her. It did not appear to Officer Medina that either Ms. Stephenson or Regina V. were under the influence of any substance.

Los Angeles Police Detective Sheryl Reynolds testified she was the investigating officer assigned to the case. In her experience, domestic violence victims recanted at least 75 percent of the time. Detective Reynolds contacted Regina V. by phone on July 2, 2012. Regina V. denied that anything happened on June 29, and denied defendant pulled out a gun or hit her. When questioned about the June 26 incident, Regina V. admitted that she and defendant argued at a Shell station, and that defendant struck her with a gun, causing bruises on her arms.

Detective Reynolds listened to a recorded jail call between defendant and Regina V., which took place on July 11, 2012. The call was played for the jury. In that call, defendant and Regina V. discussed this case. Regina V. told defendant that "these f------ detectives are trying to hunt me down." Defendant responded, "If you go to court, on me--do not go to court, b----." Regina V. responded that "I have to go to court, K? But, I don't have to answer any questions." Defendant told Regina V. that if she did say anything, to "please say something on [his] behalf." Regina V. responded, "if I have nothing to say I'm not pressing charges." Defendant told Regina V. that he would prefer that she not go to court.

Regina V. recounted for defendant an argument she had with Detective Reynolds, where Regina V. told Detective Reynolds "I'm not f------ testifying against him." Regina V. also told Detective Reynolds not to contact her anymore. Defendant reiterated that Regina V. should "stay quiet . . . ."

Regina V. told defendant that "[Ms. Stephenson's] all stressed out. . . . [¶] ['cause] they're hounding her too." Regina V. said that she and Ms. Stephenson were "hiding . . . ." Defendant became upset; "See what happens? You f------ want to call the

5

cops right away." Regina V. told him to "Shut the f--- up 'cause we can f------ both go to court . . . ." Defendant told Regina V., "Well you are gonna speak on my behalf, b----, 'cause I ain't going to f------ jail for a long time."

Regina V. told defendant that Detective Reynolds went to court to look for her, but that Regina V. showed up late and avoided her.

Defendant told Regina V. how the police had found his guns. Regina V. and defendant began to argue, and Regina V. told defendant that "I think I can describe the gun now." Defendant became upset, saying that "if I'm in here 15 years, I'm definitely coming out swell. I'll bash it up." When Regina V. joked that she would be waiting for him, defendant told her "B----, I'll f--- you up. You best not play." He also told Regina V. that it was her fault he was in jail, to which Regina V. retorted that it was his fault. Regina V. told defendant that he owed her "a lot of apologies" and defendant said he wrote her a letter where he "apologized [for] everything . . . ."

After the recording concluded, Detective Reynolds testified that, just as Regina V. had said in the taped conversation with defendant, Regina V. was very uncooperative, and became "belligerent and pissed off" during their telephone interview. Regina V. told Detective Reynolds that she would not testify or go to court, and that she did not want to press charges. However, Regina V. did not tell Detective Reynolds she had been untruthful with the officers who responded to the apartment on June 29.

According to Detective Reynolds, Regina V.'s reference to "court" in the recording was a family court appearance for which Regina V. was late, at which Detective Reynolds had tried to meet her.

Other recorded jail conversations between Regina V. and defendant were played for the jury. In a July 11, 2012 call, defendant admitted that he had "f----- up [he] should have never put hands on [her]." Defendant told Regina V. that he was "deeply . . . sorry for everything [he] put [her] through and every hand that [he] did put on [her]." Defendant asked Regina V. to write to him, but to do so under their baby's name because the police were looking for Regina V. Regina V. would not agree to do that, accusing

defendant of trying to "break [her]." Regina V. told defendant he "beat the f--- out of [her]" in front of her son, and that the child was "traumatized." Defendant responded, "You don't think I regret that?" Regina V. asked defendant if he could "fix the abuse that [he] did?" He said he could, in "due time." Defendant told Regina V. that he would let her tie him up and beat him, and would let her hit him with a gun. Defendant said "I'm not saying I did that to you, but I'll let you hit me with a gun." He agreed she could "pistol-whip [him] one time. . . . [He'd] let [her] get [her] one back." Defendant told Regina V. that he loved her, and she responded that he did not; he "just beat the s--- out of [her]." Defendant admitted that "[he] beat [Regina V.] up."

Defendant and Regina V. argued, and defendant asked, "So you're going to f--- me on this? You're going to put me away for a long time?" Regina V. said she would not; she would "never do that to nobody unless they . . . hurt [her] kids."

Defendant told Regina V. that he wanted to "beat [her] up during sex, but . . . [¶] . . . [¶] [she would not] let [him]." "That's why [he] beat [her] up and . . . had sex with [her] afterwards." Defendant told Regina V. "I have to beat you up, I have to beat you up first, then I have to have sex with you . . . ."

Regina V. told defendant that she was going to "beat [his] ass now" because now she was "the abuser . . . ." Regina V. "got two straps ready" to "beat the f--- out of [defendant] . . . ."

Defendant asked if Regina V. was going to help him "on this case" and she agreed she would. Defendant encouraged Regina V. not to show up to court, and Regina V. told him, "even if I show up and I say that . . . I don't have nothing to say . . . they might even have to drop the charges." Defendant asked what would happen if "they put handcuffs on" Regina V., and expressed concern that she was "going to start telling on [him] and tell[ing] the truth . . . . Then you'll start singing this s---. You know, it's, oh, yes, he did have a gun. Oh, yes, he had this kind of gun." Regina V. assured defendant that she had denied to the police that defendant had a gun.

7

Defendant asked Regina V. if he had to worry about Ms. Stephenson "opening her f------ mouth" and "cooperating with [the] cops?" Regina V. assured him he had nothing to worry about, but that if Ms. Stephenson did open her mouth, Regina V. would "f--- that b----."

A July 13, 2012 phone call was also played for the jury. In that call, Regina V. told defendant she was "going to deny what she told [Officer Medina] on [June] 29th."[3]

In a November 8, 2012 call, which was played for the jury,[4] defendant told Regina V., "But listen to me, motherf-----, I was hitting you and I repent on that."

The prosecution also introduced evidence of past domestic violence by defendant against Judy Zamora, the mother of one of defendant's children. Ms. Zamora testified that in April 2008, she and her three children lived with defendant, defendant's mother, and defendant's sister. Although Ms. Zamora had ended her relationship with defendant, and was seven months pregnant with another man's child, she was still renting a room in defendant's home.

On the afternoon of April 21, 2008, defendant was intoxicated, and wanted to have sex with Ms. Zamora and resume their relationship. He was upset and could not understand why Ms. Zamora would not have sex with him. Defendant called Ms. Zamora a "whore" and other names. To get away from defendant, Ms. Zamora left the apartment with her son. Defendant followed her outside, and threw a "beer"[5] at her face, hitting her near her right ear. Ms. Zamora threw the beer back at defendant. Defendant then grabbed Ms. Zamora by the hair and dragged her into the house. Patches of Ms. Zamora's hair were ripped out of her head. She tried to fight him off. Once inside,

---

**3** No transcript of this call appears in the record on appeal. We therefore rely on Officer Medina's testimony about the call.

**4** Again, there is no transcript of this call in the appellate record. We rely on Officer Medina's testimony about the content of the call.

**5** It is unclear from Ms. Zamora's testimony whether the beer was in a can or bottle.

defendant started punching Ms. Zamora on her head "so many times . . . ." He also repeatedly kicked her, and when she turned over on her stomach, he kicked her on the side, and on her mouth. "He kicked [her] everywhere." When Ms. Zamora became too tired to fight defendant off, she just tried to cover her face and stomach. She was worried about her children, who she could hear crying and screaming in the background.

Defendant's sister intervened and pulled defendant off Ms. Zamora. Ms. Zamora was able to get up and run out of the apartment. Defendant then turned his attack on his sister, and began to "really chok[e]" her. Ms. Zamora tried to get help, but no neighbor would open a door. Defendant's sister was able to break loose and call police. Defendant ran to a car; Ms. Zamora tried, unsuccessfully, to prevent him from leaving.

Ms. Zamora had pain all over her body. She was worried about her unborn child. She was taken to the hospital and treated for her injuries.

Ms. Stephenson also testified. She denied knowing or having met defendant. She was close friends with Regina V., and had known her since 2008. Ms. Stephenson admitted that she did not want to testify. When asked if someone called her for help on June 29, 2012, Ms. Stephenson said that she did not remember that day very well. That day was "hazy" because she was using drugs at the time. Ms. Stephenson admitted calling 911 toward the end of the month in June 2012, after she received a call from Regina V., and the call was disconnected. Regina V. sounded upset, and Ms. Stephenson was unable to reach her again. However, Regina V. was often distressed because she was on drugs.

Ms. Stephenson admitted having spoken with Regina V. on the phone within two weeks of her testimony at trial. They discussed the case, but Regina V. did not tell Ms. Stephenson what to say in court. Regina V. "reminded" Ms. Stephenson that both she and Ms. Stephenson were on drugs on June 29, 2012.

When Regina V. called Ms. Stephenson that day, she was "arguing or yelling or saying something . . . and then she hung up." Ms. Stephenson characterized Regina V. as being "kind of unstable at the time." Ms. Stephenson initially testified she could not

9

recall what information she gave the 911 operator. When confronted with a transcript of the 911 call, Ms. Stephenson changed her story and claimed that she did not call 911, but that a friend named "Susan" called because Ms. Stephenson was driving at the time. Ms. Stephenson continued to claim her memory of events was fuzzy because she was on drugs. After listening to the 911 call, which was played for the jury, Ms. Stephenson admitted she provided information to the 911 operator that Regina V. had given her. After the 911 call was made, Ms. Stephenson headed over to defendant's apartment, and used drugs while in the car before speaking with officers there.

During cross-examination, Ms. Stephenson testified she was a heavy drug user at the time of the 911 call, and was using methamphetamine. She was presently sober, as she was incarcerated. Ms. Stephenson met Regina V. in a drug program, and they used drugs together. Since the June 29 incident, she and Regina V. had not really spent time together, because Regina V. was "trying to get herself together" and Ms. Stephenson "was going all out until [she] got busted in October." However, in June 2012, she and Regina V. were using drugs together on a daily basis.

Ms. Stephenson did not want to testify, but was brought to court in custody. She wanted to testify accurately, and did not want to testify to things she could not recall.

According to Ms. Stephenson, Regina V. was unreliable, and had lied to Ms. Stephenson before. Regina V. would lie if it suited her. Regina V. told Ms. Stephenson she lied when she told her she needed police assistance on June 29.

The parties stipulated to the prior convictions of defendant, Regina V., Ms. Zamora, and Ms. Stephenson.

## DISCUSSION

### I. Admission of Regina V.'s Preliminary Hearing Testimony

Defendant contends the trial court erred in admitting Regina V.'s preliminary hearing testimony after finding she was unavailable as a witness. He maintains that admitting the testimony contravened his rights under the confrontation clause, arguing

the prosecution failed to show reasonable diligence in attempting to procure Regina V.'s appearance as a witness at trial. We disagree.

A. *Relevant Facts*

On March 20, 2013, this case was set for jury trial on April 9, 2013. On March 28, Regina V. was served with a subpoena compelling her presence at trial. However, on April 9, Regina V. failed to appear, and the court issued and held a body attachment. Trial was continued to April 16 and 17. On April 17, the court issued the body attachment and trailed the trial to the next day.

On April 18, 2013, the prosecutor informed the court that he did not anticipate that Regina V. would appear at trial. When he "spoke to her this last Friday, she hung up the phone on [him] and told [him] personally that she was not going to come in, there was no way she was going to come in." The district attorney investigator was out trying to locate Regina V., but was getting the "run-around," so the prosecutor believed "she's actively evading us at this point."

Los Angeles District Attorney Investigator Curtis McLean later appeared in court, and testified that he took over the search for Regina V. on March 28, from his partner, Investigator John Williams. On March 28, McLean went to a residence in Azusa, listed as Regina V.'s residence on her driver's license. When McLean arrived at the Azusa house, Regina V. was not there. He spoke with Regina V.'s 16-year-old daughter, Bianca. Bianca told McLean that Regina V. lived in Compton, but that she did not have an address for her there. However, she did give McLean Regina V.'s phone number. McLean asked Bianca to call Regina V., and Bianca complied and handed the phone to McLean. Regina V. told McLean that she did not want to go to court. McLean also spoke with Roberta V., who he believed was Regina V.'s aunt. She did not have a new address for Regina V.

Then, unexpectedly, Regina V. showed up at the Azusa house. McLean personally served her with a subpoena to appear for trial on April 9. Regina V. told

McLean "I'm not taking that." McLean informed her that she had been served. Regina V. walked in the house and McLean left the subpoena at the front door.

On April 16, McLean did a search for wants and warrants for Regina V. He discovered the bench warrant for her failure to appear on April 9, as well as a no-bail felony warrant for attempted robbery, and a warrant for misdemeanor theft. He was not aware of the no-bail warrant when he served her with the trial subpoena on March 28.

On April 18, McLean drove out to the Azusa residence again. Regina V.'s grandmother answered the door, and informed McLean that Regina V. was not there, and was not currently residing at that address. She had no further information as to Regina V.'s whereabouts, and would not provide McLean with an address. McLean asked Regina V.'s grandmother whether Bianca was living at the Azusa house, and she responded that "she's not living there now, and that she's with [Regina V.]."

McLean also tried to call Regina V. on April 18, and left her two voicemail messages. Because of the outstanding warrants, McLean checked various databases to see if Regina V. was in custody. McLean checked the Los Angeles County Sheriff's inmate locater page, as well as the state database for the Department of Corrections. McLean also checked the database for the Orange County Sheriff's Department. He also consulted a public records database to determine if there was any other contact information or other address for Regina V., but was unable to find any.

During his initial contact when he served the subpoena on Regina V. on March 28, McLean was not aware that she had outstanding warrants. McLean did not search for Regina V. between March 28 and April 15.

At the conclusion of McLean's testimony, defense counsel argued the prosecution had not exercised reasonable diligence to secure Regina V.'s presence at trial, reasoning it was obvious from the preliminary hearing that Regina V. was uncooperative. The trial court concluded that the prosecution had used reasonable diligence, and that the evidence clearly demonstrated that Regina V. was evading police. Accordingly, the trial court

12

concluded that Regina V. was unavailable, and that the prosecution could rely on her testimony from the preliminary hearing.

      B.    *Analysis*

"The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial. [Citations.] California allows introduction of the witness's prior recorded testimony if the prosecution has used 'reasonable diligence' (often referred to as due diligence) in its unsuccessful efforts to locate the missing witness. [Citation.] . . .)" (*People v. Cromer* (2001) 24 Cal.4th 889, 892 (*Cromer*); Evid. Code, §§ 240, subd. (a)(5), 1291.)

      To determine whether the prosecution has exercised reasonable diligence to locate and to produce a witness at trial, courts consider the totality of the efforts undertaken, including whether the search was timely begun; the importance of the witness's testimony; whether leads were competently explored; whether the prosecution reasonably believed before trial that the witness would appear willingly and therefore did not subpoena the witness when he or she was available; and whether the witness would have been produced if reasonable diligence had been exercised. (*Cromer*, *supra*, 24 Cal.4th at p. 904; *People v. Sanders* (2005) 11 Cal.4th 475, 523.) The fact that the prosecution could have taken some further or additional step does not render its efforts unreasonable; reasonable diligence is all that is required. (*People v. Wilson* (2005) 36 Cal.4th 309, 342; *People v. Diaz* (2002) 95 Cal.App.4th 695, 706.) The prosecution is obliged only to use "reasonable efforts" to procure a witness. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298.)

A trial court's findings regarding reasonable diligence present a mixed question of fact and law. (*Cromer*, *supra*, 24 Cal.4th at p. 893.) Therefore, we review the trial court's factual findings for substantial evidence (*id*. at pp. 894, 900-902), and the trial court's diligence determination de novo. (*Id*. at pp. 900-901.) Because the facts here are not in dispute, we must decide de novo whether the prosecution exercised reasonable diligence in trying to secure Regina V.'s presence at trial.

Defendant contends the prosecution did not exercise reasonable diligence, arguing it made no attempt to contact Regina V. between the August 14, 2012 preliminary hearing and March 28, 2013. Defendant reasons that the prosecution should have began searching for Regina V. far in advance of trial, given her reluctance to testify at the preliminary hearing. Defendant makes various other arguments we need not address, because the key fact that distinguishes this case from the authorities defendant cites is that in this case, *the prosecution effected service of a trial subpoena but the witness with the assistance of her family successfully evaded arrest on the body attachment.*

Defendant relies almost exclusively on *Cromer*, *supra*, 24 Cal.4th 889. There, the prosecution was on notice of a witness's disappearance less than two weeks after the preliminary hearing in June 1997, and more than two months before the original trial date in September 1997. A subpoena was issued for the witness to attend trial in September, but the prosecution made no effort to serve it on the witness. (*Id*. at p. 903.) The prosecution also did not attempt to serve a subsequently issued subpoena for the continued trial date of December 1997. Even though the prosecution knew as early as June 1997 that the witness had disappeared, the only effort made to locate her was in December, on the eve of trial, when investigators made several visits to her former residence. (*Ibid*.) Trial was continued again to January 1998, and only after the case had been called for trial, the prosecution finally learned the witness was living with her mother in San Bernardino. (*Ibid*.) The prosecution, however, waited two full days to follow up on this information and obtain the mother's address. (*Id*. at pp. 903-904.) After jury selection had begun, an investigator went to the mother's residence, and

14

neither mother nor the witness were there. However, the mother was expected to return the next day. The investigator did not return to the residence to speak with the mother, or make any other effort to contact her. (*Id*. at p. 904.) On this evidence, the court concluded that the prosecution did not exercise reasonable diligence, because "serious efforts to locate [the witness] were unreasonably delayed, and investigation of promising information was unreasonably curtailed." (*Id*. at p. 904.)

Unlike *Cromer*, Regina V. did not disappear between the preliminary hearing and trial date. Although she had expressed reservations about testifying, she had testified at the preliminary hearing despite expressing similar reservations. Therefore, there was no reason to expect she would not appear at trial. Moreover, the key distinction here is that the prosecution effected timely service of a trial subpoena upon Regina V. at the address listed on her driver's license as her residence, and had no reason to know that, thereafter, her family members would help her evade arrest on the body attachment. When Regina V. did not appear on the April 9 trial date, the prosecution's investigator conducted numerous computerized searches, called Regina V., visited the address where she had been previously served, and queried the family members there, to no avail.

Even if McLean had known about the no-bail warrant when he served the trial subpoena on Regina V. on March 28, reasonable diligence would not have required him to deprive *the victim* of her liberty rights when she willingly spoke with him on her cell phone and returned home, knowing he wanted to serve her with a subpoena. It is speculative to assume that if McLean had pursued any other leads, he would have procured Regina V.'s presence at trial. "[I]t is fairly clear [that Regina V.] purposely made herself unavailable because she was unwilling to testify." (*People v. Diaz*, *supra*, 95 Cal.App.4th at p. 706.)

Under these circumstances, we conclude the prosecution met its burden to establish that it exercised reasonable diligence in attempting secure Regina V.'s presence at trial.

## II.    *Pitchess* Review

Defendant made a pretrial *Pitchess* motion for discovery of the contents of the personnel files of Officers Cardenas, Medina, and Herrera, for false report writing, false testimony, and fabrication of probable cause or reasonable suspicion.  Counsel's declaration in support of the motion averred that, according to Regina V.'s preliminary hearing testimony, the officers were lying about Regina V.'s statements to them.  The trial court granted the motion, limiting it to "factual allegations that the officers were dishonest; not just dishonest, but lying on police reports or in court.  [¶] . . . [¶] . . . So false police reports, perjury, planting evidence, lying on police reports . . . ."  The trial court then held an in camera hearing.   Defendant does not contend the court erred by the scope of its *Pitchess* search.

A criminal defendant is entitled to discovery of relevant documents or information in the confidential records of the peace officers, provided it does not concern officer conduct occurring more than five years before the incident, the results of internal police investigations, or facts with no practical benefit to the defense.  (*People v. Gaines* (2009) 46 Cal.4th 172, 179, 182; see also Evid. Code, § 1045, subd. (b).)  We review the trial court's determination on the discoverability of material in peace officer personnel files for an abuse of discretion.  (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228.)

Defendant has requested that this court conduct an independent examination of the in camera *Pitchess* proceedings to determine whether any responsive documents were wrongly withheld.  Such a review is authorized under *People v. Mooc*, *supra*, 26 Cal.4th at page 1226.  We have reviewed the record of the trial court proceedings, including a sealed reporter's transcript of the trial court's in camera review of the records for all three officers.  Based upon our review of the record, we conclude the trial court's order concerning the disclosure of *Pitchess* materials was correct, because no discoverable documents existed.

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

We concur:

BIGELOW, P. J.

FLIER, J.