Filed 3/30/26  P. v. Petrakis CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KOSTA PETRAKIS,<br><br>    Defendant and Appellant. | H051126<br>(Santa Clara County<br> Super. Ct. No. C2014894) |

Appellant Kosta Petrakis, convicted of robbery, contends his conviction must be reversed because the court erroneously denied his requests to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) and admitted the prior testimony of a witness upon an inadequate showing of prosecutorial due diligence.  Petrakis further contends that his trial counsel's concession of guilt for a lesser-included offense during closing argument was structural error under *McCoy v. Louisiana* (2018) 584 U.S. 414 (*McCoy*).  We will affirm.

## I.    BACKGROUND

The Santa Clara County District Attorney charged Petrakis with second degree robbery (Pen. Code,[1] § 212.5, subd. (c); count 1) and threatening to commit a crime resulting in death or great bodily injury (§ 422, subd. (a); count 2).  The district attorney

---

[1] Undesignated statutory references are to the Penal Code.

also alleged that Petrakis personally used a knife while committing the charged offenses (§ 12022, subd. (b)(1)). The evidence introduced at trial was that Petrakis shoplifted razors and insoles at a Grocery Outlet store and, once confronted by the store manager and two other employees in the parking lot, brandished a knife that he threatened to use against the employees to make his escape. Police apprehended Petrakis near the store and recovered the stolen merchandise and a knife.

## A.      Faretta *Requests*

The public defender represented Petrakis throughout the proceedings, despite Petrakis's four requests to substitute counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

Petrakis first moved to represent himself on January 3, 2023, about two months before trial.[2] Petrakis completed a written *Faretta* waiver and told the trial court that he understood he was facing "very serious charges." When asked if he knew his maximum exposure, Petrakis replied six years while the district attorney stated five years eight months. Neither were correct.[3] Before the court ruled, Petrakis emphasized he "won't stand trial . . . with somebody representing me that's appointed by the [c]ourt."

Without additional questioning, the court denied Petrakis's *Faretta* request, stating: "I don't think you appreciate the nature of what you have to do. I'm concerned." After the denial, Petrakis again expressed his desire to "separate" from the public defender's office, stating that he would not go to trial while being "represented by the

---

[2] In total, Petrakis moved to represent himself three times—on October 1, 2021, January 3, 2023, and March 13, 2023. Petrakis also sought to make a fourth *Faretta* request after the court sentenced him on June 7, 2023, but the court declined to hear the request at that time. Petrakis alleges error only as to the denial of his January 3 and March 13 *Faretta* requests.

[3] The correct maximum sentence Petrakis can receive for the charges and enhancement is six years eight months, as the prosecutor subsequently stated at the March 13 *Faretta* hearing.

public defender's office" and accusing the office of violating his due process rights. When the court reminded Petrakis that he had already had a *Marsden* hearing to address the substitution of counsel, Petrakis replied, "That was just a fluke. That was a mistake. That shouldn't have happened. I should have been *Faretta* [from] day one." Petrakis indicated he intended to file another *Faretta* motion immediately.

Petrakis did not make his next *Faretta* request until March 13, after jury selection but before opening statement. In the intervening months, he requested two *Marsden* hearings, and during both, told the court he no longer wished to represent himself and sought substitute counsel. The court denied the requests.

At the March 13 *Faretta* hearing, the trial court advised Petrakis of his constitutional rights and admonished him against the perils of self-representation.[4] Petrakis indicated he understood the charges against him and his maximum exposure. When asked if he understood how to give an opening statement and closing argument, Petrakis responded he did not "plan to say a single word during the entire thing so [it] shouldn't be a problem." When asked if he knew how to object, Petrakis expressed reservation, telling the court, "I mean, obviously I'm not a trained attorney . . . . [¶] . . . [¶] Which is why I asked for a pro bono lawyer once I realized that [the public defender's office and I are] not going to see eye to eye." When asked if he knew how to protect his appellate rights, Petrakis responded, "That's pretty tough. No. So maybe we don't want to do a *Faretta* motion . . . . I believe I need a pro bono lawyer . . . . [¶] That's what I think. That's why I think I need a pro bono lawyer, not an alternate defender. And that's why I do think I need counsel." The court denied the motion, and Petrakis immediately requested another *Marsden* hearing, which the court heard and denied the same day.

---

[4] The trial judge presiding at the March 13 *Faretta* hearing (and subsequent jury trial) was not the same judge who presided at the January 3 hearing.

**B.** *Request to Admit Prior Testimony*

The store manager had testified without incident at the preliminary hearing but was not produced for trial. After searching in vain for approximately two weeks, the prosecution moved to admit the manager's preliminary hearing testimony based on his unavailability.

The prosecution's motion included the declaration of Matt Volkman, a process server from the district attorney's office. The Volkman declaration detailed the efforts Volkman undertook to locate the witness: Volkman received the request to serve the witness on February 16 for a trial set on March 6, reviewed the police report for the witness's address and contact information, and researched updated addresses and contact information for him in a law enforcement database called "TLO." Volkman began searching for the witness in earnest on February 24, and from then until March 8, (1) attempted to contact him several times using his last known phone number and other associated phone numbers, (2) visited the witness's last known workplace and spoke with a supervisor, (3) visited the witness's last known residence, (4) visited a second residence associated with him, (5) contacted a possible relative found on the TLO database, and (6) put in an EDD request to obtain the witness's "employment information and current address information." While Volkman was able to confirm the witness's current address through the EDD request, he could not locate him at that address or anywhere else.

Despite initially expressing some reservation regarding the timeliness of the prosecution's efforts, the trial court granted the motion, finding that the witness was unavailable, and that the prosecution had "made good efforts—good faith efforts and exercised reasonable diligence, based upon the totality of the circumstances, in attempting to secure [the witness's] appearance at trial." The court also found that Petrakis had similar motive and interest to cross-examine the witness at the preliminary hearing.

4

## C. *Trial Counsel's Closing Argument*

During closing argument, Petrakis's trial counsel told the jury, "It's an undisputed fact that Mr. [Petrakis] stole $16 worth of merchandise . . . . [¶] . . . [¶] The theft is not disputed."[5] Counsel then argued that the prosecution had failed to prove the two elements of the offense that elevated the conceded petty theft to a robbery—the use of force or fear, and the intent to permanently deprive the owners of their property. Counsel also argued the prosecution failed to prove each element of the criminal threats charge.

## D. *Verdict and Sentencing*

The jury convicted Petrakis of second degree robbery and found true the allegation that he used a knife. The jury acquitted Petrakis of making criminal threats. The trial court suspended imposition of sentence and placed Petrakis on three years' probation with no time in custody.

## II. DISCUSSION

## A. *Denial of* Faretta *Requests*

Petrakis argues the trial court erred in denying his January 3 and March 13 *Faretta* requests. The Sixth Amendment grants a criminal defendant the right to present a defense and to represent himself upon a timely and unequivocal request. (*People v. Dunkle* (2005) 36 Cal.4th 861, 908 (*Dunkle*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Erroneous denial of the right to self-representation is reversible per se. (*People v. Dent* (2003) 30 Cal.4th 213, 217 (*Dent*).) But "[e]ven after effective invocation, the right to self-representation can be waived . . . expressly or impliedly through conduct that is inconsistent with the assertion of the right." (*People v. Fedalizo* (2016) 246 Cal.App.4th 98, 104 (*Fedalizo*); see also *People v. D'Arcy* (2010) 48 Cal.4th 257, 285 [explaining that "a waiver or abandonment

---

[5] Petrakis elected to not attend portions of his trial, including counsel's closing argument.

of the *Faretta* right . . . may be inferred from a defendant's conduct"].) A waiver of a defendant's *Faretta* right " 'may be found if it reasonably appears to the court that defendant has abandoned his initial request to represent himself.' " (*People v. Kenner* (1990) 223 Cal.App.3d 56, 61 (*Kenner)*.)

Having considered the two *Faretta* requests, we will assume that Petrakis's January 3 request effectively invoked his right of self-representation but conclude that he waived that right by later disavowing any wish to represent himself. As to Petrakis's March 8 request, we discern no error, because Petrakis did not make an "unequivocal demand to represent himself." (See *People v. Boyce* (2014) 59 Cal.4th 672, 703 (*Boyce*).)

### 1. *January 3* Faretta *Request*

Petrakis contends the trial court's denial of this *Faretta* request was based on improper considerations—the court's belief that Petrakis lacked sufficient legal knowledge to represent himself. In this regard, he is correct. A defendant's " ' "technical legal knowledge" is irrelevant to the court's assessment of the defendant's knowing exercise of the right to defend himself.' " (*Dent*, *supra*, 30 Cal.4th at p. 217; see also *Godinez v. Moran* (1993) 509 U.S. 389, 400 [holding that a "defendant's ability to represent himself has no bearing upon his competence to choose self-representation" (italics omitted)].) Rather, "the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself." (*Godinez,* at p. 399.) By focusing on whether Petrakis appreciated the nature of what he was doing in choosing to represent himself, the court erred.

But this does not end our inquiry, because we must also consider whether Petrakis subsequently waived his right of self-representation through words or conduct "inconsistent with the assertion of the right." (See *Fedalizo, supra,* 246 Cal.App.4th at p. 104.) "The standard for waiving the right to self-representation is substantially less stringent than it is for waiving the right to counsel." (*Ibid*.) For example, in *Dunkle,*

although the trial court erred in denying defendant's *Faretta* request, the Supreme Court held that this error was cured when the defendant told the court at a later hearing, " 'I don't want to represent myself. I want the lawyer.' " (*Dunkle*, *supra*, 36 Cal.4th at p. 908.)

Here too, if the trial court erred in denying the *Faretta* request on January 3, the record establishes that Petrakis waived that right in subsequent proceedings, when he informed the trial court he no longer wished to represent himself and asked the court to appoint for him different counsel. By disavowing his intent to represent himself and repeatedly asking the court for substitute counsel, Petrakis effectively waived his right of self-representation through both words and conduct "inconsistent with the assertion of the right." (See *Fedalizo*, *supra*, 246 Cal.App.4th at p. 104; see also *Kenner*, *supra*, 223 Cal.App.3d at p. 61 [holding that even after a " 'defendant requests to represent himself, . . . the right may be waived through defendant's subsequent conduct indicating he is vacillating on the issue or has abandoned his request altogether' "].)

### 2. *March 13* **Faretta** *Request*

Petrakis renewed his *Faretta* request on March 13, after jury selection had concluded but before opening statements. The trial court denied the request as untimely and based on "deficits" in Petrakis's legal knowledge, and Petrakis now argues that was an abuse of discretion. We need not resolve the question of timeliness because "the record as a whole establishes defendant's request was nonetheless properly denied on other grounds." (*Dent*, *supra*, 30 Cal.4th at p. 218.) The denial of this second *Faretta* request was proper because it was not an "unequivocal demand to represent himself." (*Boyce*, *supra*, 59 Cal.4th at p. 703.)

In determining whether a defendant's demand is unequivocal, a court considers not only the fact of a defendant's request, but also his "words and conduct to decide whether he . . . truly wishes to give up the right to counsel and represent himself." (*People v. Marshall* (1997) 15 Cal.4th 1, 25–26.) "Because the court should draw every

reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied." (*Ibid*.)

Petrakis's March 13 *Faretta* request was ambivalent from the start. When the court asked Petrakis if he wished to represent himself, Petrakis responded, "Yeah. That's what it seems like. That seems to be the best option." Petrakis expressed doubts about handling certain aspects of trial and reaffirmed his interest in representation by counsel (albeit different counsel): "[O]bviously, I'm not a trained attorney . . . . [¶] . . . [¶] Which is why I asked for a pro bono lawyer once I realized that [the public defender's office and I are] not going to see eye to eye." Later in the hearing, Petrakis told the court, "[M]aybe we don't want to do a *Faretta* motion" and again expressed his desire for counsel: "I believe I need a pro bono lawyer . . . . [¶] I think I need a pro bono lawyer, not an alternate defender. *And . . . I do think I need counsel*." (Italics added.) (See *People v. Scott* (2001) 91 Cal.App.4th 1197, 1204 [concluding that defendant's statements that he wanted to represent himself "only because he wanted to rid himself of appointed counsel" were too equivocal to constitute a *Faretta* request]; *People v. Williams* (1990) 220 Cal.App.3d 1165, 1170 [holding that *Faretta* request was " 'at best equivocal and hardly an unqualified waiver since [defendant] only wanted to represent himself if the court would not give him another attorney' "].)

Because the record of the March 13 hearing shows that Petrakis did not make an "unequivocal demand to represent himself," the court did not err in denying that request. (*Boyce*, *supra*, 59 Cal.4th at p. 703.)

**B.  *Admission of Prior Testimony***

Petrakis next argues that admission of the store manager's preliminary hearing testimony violated his confrontation rights. Specifically, Petrakis contends that the

8

prosecution failed to exercise due diligence to secure the witness's presence at trial and thus failed to show unavailability.

### 1. *Legal Principles and Standard of Review*

A defendant in a criminal trial has the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *People v. Herrera* (2010) 49 Cal.4th 613, 620 (*Herrera*).) "[T]he constitutional right of confrontation is not absolute," however. (*Herrera*, at p. 621.) Among other exceptions, a witness's testimony against the defendant at a prior proceeding, where that witness was subject to cross-examination, may be admitted when the witness has since become unavailable. (*Ibid*.; Evid. Code, § 1291, subd. (a)(2).)

A witness is unavailable if the prosecution "has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) The term "reasonable diligence"—used interchangeably with "due diligence" in case law—" ' " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' " (*Herrera*, *supra*, 49 Cal.4th at p. 622.) "Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' " (*Ibid*.) As long as " 'substantial good faith' " efforts are undertaken to locate a witness, the fact that " 'additional efforts might have been made or other lines of inquiry pursued' " does not indicate lack of diligence because " '[t]he law requires only reasonable efforts, not prescient perfection.' " (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706 (*Diaz*).)

On appeal, "[w]e review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence." (*Herrera*, *supra*, 49 Cal.4th at p. 623.)

## 2. *Due Diligence*

Petrakis contends that the prosecution's efforts to secure the store manager's presence were "clearly inadequate," because they consisted only of "calling years old phone numbers, going by old addresses, and possibly talking to a relative." But Volkman's undisputed declaration reflected that before trial, Volkman researched the witness's current contact information via a law enforcement database and an EDD request, made numerous visits to the witness's last known residence and other associated residences, and contacted his last known employer and one of his relatives. These are reasonable and substantial good faith efforts to secure the witness's presence at trial. (*Diaz*, *supra*, 95 Cal.App.4th at p. 706.)

Petrakis next suggests the prosecution lacked diligence because their effort to locate the store manager only "lasted intermittently for about two weeks." Two weeks is on the shorter side of due diligence. (See *People v. Avila* (2005) 131 Cal.App.4th 163, 170 [cataloguing various timeframes in connection with due diligence standard].) But under these circumstances—where the witness appeared without incident at the preliminary hearing and the record gave no indication that he would become unaccountably absent before trial—it is sufficient. This is because "the prosecution is not required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing." (*People v. Wilson* (2005) 36 Cal.4th 309, 342; see also *Diaz*, *supra*, 95 Cal.App.4th at p. 706 [holding that the court cannot " 'properly impose upon the People an obligation to keep "periodic tabs" on every material witness in a criminal case' "].)

Petrakis also faults the prosecution for not resorting to other measures to locate the store manager. For example, Petrakis suggests the prosecution should have contacted the two employees who worked at Grocery Outlet with the manager or consulted social media and the manager's neighbors. But the fact that " ' " 'additional efforts might have been made or other lines of inquiry pursued does not affect' " ' " our conclusion that the

prosecution exercised reasonable diligence.  (*People v. Andrade* (2015) 238 Cal.App.4th 1274, 1294.)  " ' " 'It is enough that [the prosecution] used reasonable efforts to locate the witness' " ' " (*ibid*.), and we " 'will not reverse a trial court's determination [of witness unavailability] simply because the defendant can conceive of some further step or avenue left unexplored by the prosecution.' " (*Diaz*, *supra*, 95 Cal.App.4th at p. 706).

In our independent judgment, the prosecution showed reasonable diligence to secure the store manager's attendance at trial.  So the trial court did not err in determining that he was unavailable and admitting his prior testimony.

## C.    McCoy *Error*

Finally, Petrakis contends that his trial counsel violated his Sixth Amendment right to maintain his innocence when in closing argument she conceded his commission of the lesser included offense of petty theft.  According to Petrakis, he had maintained his innocence throughout the proceedings, stating "innumerable times" to court and counsel that he "did not do the crimes."

*McCoy* does not help Petrakis because the record upon which Petrakis has elected to rely does not establish a clear directive to counsel that his objective at trial was to maintain innocence.  (See *Bernal*, *supra*, 42 Cal.App.5th at p. 1166.)[6]  It is true that Petrakis told the trial court many times (in counsel's presence) that he did not commit the charged offenses and that the district attorney lacked the evidence to convict him.  It is also true that Petrakis's denials of guilt, together with his *Marsden* and *Faretta* requests, should have alerted counsel to consult Petrakis before conceding any element of the charged or lesser offenses.  But *McCoy* requires more than imprudence; it requires that a

---

[6] We requested supplemental briefing from the parties, both on the substantive scope of *McCoy*, and on the predicate question of whether we may consider statements Petrakis made during confidential *Marsden* hearings to assess his *McCoy* claim.  Petrakis has declined to waive the attorney-client privilege underlying his statements from those hearings and has asked us to limit our consideration of his claim to "public statements." We will defer to Petrakis's election in this regard.

defendant make clear to counsel his desire to pursue his claim of innocence *as a matter of trial strategy*, or to " ' "intransigent[ly]" ' " object to any concessions of guilt. (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1055 (*Villa*).) Here, nothing in the record Petrakis has elected to rely on suggests that Petrakis instructed counsel to maintain his innocence on the lesser included offense at trial.

Nor does this record show that Petrakis unambiguously objected to any tactical concession at trial. (See *Villa*, *supra*, 55 Cal.App.5th at p. 1056 ["California courts following *McCoy* repeatedly have held that case applies only where defendant actively opposes counsel's concession"].)[7] Unlike *McCoy*, there was no indication that before closing argument, Petrakis instructed counsel not to concede even a lesser included misdemeanor. (Compare *McCoy*, *supra*, 584 U.S. at pp. 418–419.) Nor is this case like *Eddy*, where testimony during a postverdict hearing established that trial counsel had known before closing argument that the defendant disagreed with the strategy of conceding manslaughter as a lesser included offense but did so anyway. (See *Eddy*, *supra*, 33 Cal.App.5th at p. 482; see also *In re Smith* (2020) 49 Cal.App.5th 377, 390 [no *McCoy* error when defendant objected to concession of guilt during closing argument because "it cannot be said that at the time counsel made the concession, it was over petitioner's intransigent and unambiguous objection"]; *People v. Lopez* (2019) 31 Cal.App.5th 55, 66 ["we have found no authority . . . allowing extension of *McCoy*'s holding to a situation where the defendant does not expressly disagree with a decision relating to his right to control the objective of his defense"].)

Instead, Petrakis announced that he "trust[ed]" trial counsel and had "no problem letting her just go ahead and do the entire trial on her own." Petrakis did in fact

---

[7] Petrakis does not here contend that trial counsel failed to consult him about trial strategy. In any event, the record is insufficient to rebut the "strong presumption" that counsel's conduct, at least as it pertains to consultation, fell within the "wide range of reasonable professional assistance." (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

voluntarily absent himself from significant portions of trial (including closing arguments), told counsel that he "definitely won't talk to [her]", and at one point, may have blocked counsel's number to prevent counsel from reaching him. (See *McCoy*, *supra*, 584 U.S. at p. 424 [explaining that "[i]f a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest"]; *People v. Franks* (2019) 35 Cal.App.5th 883, 891 [no *McCoy* error when counsel's concession occurred after defendant refused to speak to counsel, rejected counsel's correspondence, and declined to attend trial].) On the record that Petrakis has delimited, there is no evidence that trial counsel knew when she conceded Petrakis's guilt for the lesser included misdemeanor that this was against Petrakis's express wishes for his trial. Petrakis has accordingly not shown *McCoy* error.

### III.  DISPOSITION

The judgment is affirmed.

13

_____

LIE, J.

WE CONCUR:


_____

GREENWOOD, P. J.


_____

GROVER, J.


*People v. Petrakis*
H051126